**ALLIS-CHALMERS MANUFACTURING COMPANY, a Delaware corporation, Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

No. 12331.

United States Court of Appeals
Seventh Circuit.

Dec. 11, 1958.

Rehearing Denied Jan. 9, 1959.

John L. Waddleton, Milwaukee, Wis., Joseph C. Wells, Washington, D. C., John G. Kamps, Milwaukee, Wis., Reilly, Wells & Rhodes, Washington, D. C., Quarles, Herriott & Clemons, Milwaukee, Wis., of counsel, for petitioner.

Thomas J. McDermott, Associate Gen. Counsel, Owsley Vose, Atty., National

**614**

Labor Relations Board, Washington, D. C., Jerome D. Fenton, Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, Frederick U. Reel, Atty., National Labor Relations Board, Washington, D. C., for respondent.

Before SCHNACKENBERG, PARKINSON and KNOCH, Circuit Judges.

SCHNACKENBERG, Circuit Judge.

Allis-Chalmers Manufacturing Company, a Delaware corporation, herein called the Company, asks us to review and set aside an order[1] of the National Labor Relations Board, issued against the Company, pursuant to § 10(c) of the National Labor Relations Act.[2] The order required the Company to bargain collectively with the International Union, United Automobile, Aircraft & Agricultural Implement Workers of America, AFL-CIO, herein called the Union, on behalf of certain employees at the Company's Pittsburgh Works. According to the Company, the "defect relied upon is the invalidity of the prior election and certification [of the Union] upon which the order is based". According to the Board, the "basic issue in the case is whether the Board abused its discretion in failing to set aside an election because of inaccuracies appearing in union campaign propaganda distributed the morning of the election in answer to employer propaganda distributed the preceding evening".

The election, held October 17, 1956, was to determine whether a majority of the employees in a unit composed of designers and draftsmen in the product engineering department of that plant wanted the Union to be their bargaining representative. The vote was 47 for the Union and 45 against it. There were 94 eligible to vote.

Both the Union and the Company, during the period preceding the election, issued campaign propaganda, seeking thereby to persuade the employees to vote for one side or the other. On the eve of the election the Company distributed among the voting employees a letter signed by its general manager, stating, *inter alia:*

"The Company follows a firm policy of fair and courteous treatment of all employees whether or not they are represented by a Union. I would like to briefly review with you some of the substantial benefits which the Company has voluntarily placed into effect for salaried employees:

1. Group Life Insurance.

2. Health and Accident Insurance.

3. Vacation Plan.

4. Paid Holidays.

5. Liberal Overtime Provisions.

6. Annual Improvement Salary Increases.

7. Cost-of-living Adjustment Plan.

8. Pension Plan.

9. Education Opportunities Through College Tuition Refund Plan."

On election morning, the Union distributed among the same employees a letter stating in part:

"Local Management goes to great length to impress us with their generosity—Lets look *at the facts —The items listed in* [the Company's] letter of yesterday *are benefits negotiated with AC* for Production and Maintenance people by UAW and passed along to us in restricted form * * *." (Italics supplied.)

and

"We feel that we should not be in position of being completely at the mercy of the Company to pass along to us the scraps from the Bargaining Table *after negotiating with the Shop Union* * * *." (Italics supplied.)

The Company filed a timely objection on the ground that the above-quoted

---

1. April 28, 1958, 120 N.L.R.B. No. 86.

2. 29 U.S.C.A. § 160(c).

Union statement was false. In support thereof, it submitted to the Regional Director a written documentation, including data as to each of the nine items mentioned in its letter. For instance, as to item 9, it stated:

"9. Educational Opportunities through College Tuition Refund Plan.

"Initiated by UAW Negotiations?

"No such program has been negotiated with any union.

"From time to time the Company has had programs of this type.

"For example, in 1951 Allis-Chalmers Pittsburgh Works inaugurated a plan of reimbursing employes in the amount of 90% of their tuition costs for advanced education. See Document No. 11 attached.

"This plan attracted favorable newspaper notice at the time as indicated by the attached clipping (Document No. 12) from the April 15, 1955 Pittsburgh Press.

"This year the Company voluntarily established its Company-wide College Tuition Refund Plan under which employes recover 100% of tuition spent for successfully completed advanced technical college courses.

"Attached as Document No. 13 is a description of this Plan and attached as Document No. 14 is the application form for participation."

The Regional Director reviewed the objections and issued a report, in which he said, *inter alia:*

" * * * It appears that prior to the advent of the [Union] as bargaining representative of the Pittsburgh Works production and maintenance employees, the salaried employees already had some form of group life insurance, health and accident insurance, vacations, paid holidays, overtime provisions and pensions.

" * * * A plan for educational opportunities through college tuition refund was instituted at the Pittsburgh Works in 1951 and has not been a subject of negotiations with the [Union]. All of the other eight (8) items have been the subject of negotiations with the [Union] during various contract negotiations and have been covered in [Union's] contracts with the Employer.

" * * * The education plan is apparently available to any employee interested in taking advanced study in engineering, science and business administration."

Insofar as the Union's letter refers to the role of the Union in the achievement of benefits by the salaried employees, the Regional Director was of the opinion that "this is essentially a matter of interpretation and that it cannot conclusively be said to constitute a falsity. However, the Union's assertion that the benefits were passed on to salaried employees in restricted form appears to be inaccurate."

The Regional Director also said that he was "of the opinion that no campaign trickery was involved herein and that the employees were entirely competent to evaluate the statements complained of." He concluded "the challenged statements did not exceed permissible campaign propaganda and did not prevent the employees from exercising a free choice in the election."

The Company's exceptions to the report were overruled by the Board, which issued a certificate to the Union. This was followed by the Company's declining to meet with the Union for the purpose of collective bargaining, because of its belief that the Union did not represent a majority of the employees in the stipulated unit.

On complaint filed for violation of § 8 (a) (1) and (5) of the National Labor Relations Act,[3] a hearing was held and the Board adopted the trial examiner's

---

3.  29 U.S.C.A. § 158(a) (1) and (5).

findings, conclusions and recommendations and issued the order which is now before us.

To meet the Company's claim that the election should be set aside because of the false statements of the Union the Board asserts in its brief that the "Union's various contracts with the Company on behalf of other employees apparently do embrace virtually all the items listed in the Company's letter." What the Board means by "virtually" is revealed by its subordination in a footnote of item 9, relating to the Company's "plan for refund of college tuition for employees taking advanced study in engineering, science, and business administration." It speaks of item 9 as "the sole exception". Furthermore, in its brief, the Board concedes that, insofar as the Union states that the benefits in question were passed on "in restricted form," its letter was inaccurate.

To us this "inaccuracy" related to a material matter. Also, the subject of item 9 is a material matter. Even if we were to assume that the first eight items were, as a matter of fact, negotiated for the production and maintenance workers by the Union and passed along to the draftsmen in restricted form, it remains concededly that item 9 did not go through that process, a fact which cannot be ignored. If truth is diluted, it is no longer truth. A glass of pure water is no longer pure if a one-ninth part thereof is contaminated, nor is it "virtually" pure. There cannot be "virtually" the truth any more than there can be "virtually" a virgin. The deviation from truth in this case is substantial and significant, especially when considered in its possible effect upon the election, where any one vote, if it had been cast against the Union instead of for it, would have changed the result.

No one knows the importance of the Company's college tuition refund plan to the voting employees. Lacking the means of dependable subjective investigation, the law requires that no un-

truth be spoken in regard to the plan in the guise of what the Board described as campaign propaganda.

While the Company makes several other serious attacks upon the order of the Board, the reasons we have already set forth require that the order of the Board entered April 28, 1958, be set aside. It is so ordered.

Order Set Aside.