ATKINSON ET AL. *v.* SINCLAIR REFINING CO.

No. 430.   Argued April 18, 1962.—Decided June 18, 1962.

*Gilbert A. Cornfield* argued the cause for petitioners. With him on the briefs were *Gilbert Feldman* and *William E. Rentfro.*

*George B. Christensen* argued the cause for respondent. With him on the briefs were *Fred H. Daugherty* and *Richard W. Austin.*

*J. Albert Woll, Theodore J. St. Antoine* and *Thomas E. Harris* filed a brief for the American Federation of Labor and Congress of Industrial Organizations, as *amicus curiae,* urging reversal.

MR. JUSTICE WHITE delivered the opinion of the Court.

The respondent company employs at its refinery in East Chicago, Indiana, approximately 1,700 men, for whom the petitioning international union and its local are bargaining agents, and 24 of whom are also petitioners here. In early February 1959, the respondent company docked three of its employees at the East Chicago refinery a total of $2.19. On February 13 and 14, 999 of the 1,700 employees participated in a strike or work stoppage, or so the complaint alleges. On March 12, the company filed this suit for damages and an injunction, naming the international and its local as defendants, together with 24 individual union member-employees.

Count I of the complaint, which was in three counts, stated a cause of action under § 301 of the Taft-Hartley Act (29 U. S. C. § 185) against the international and its local. It alleged an existing collective bargaining agreement between the international and the company containing, among other matters, a promise by the union not to strike over any cause which could be the subject of a grievance under other provisions of the contract. It was

alleged that the international and the local caused the strike or work stoppage occurring on February 13 and 14 and that the strike was over the pay claims of three employees in the amount of $2.19, which claims were properly subject to the grievance procedure provided by the contract. The complaint asked for damages in the amount of $12,500 from the international and the local.

Count II of the complaint purported to invoke the diversity jurisdiction of the District Court. It asked judgment in the same amount against 24 individual employees, each of whom was alleged to be a committeeman of the local union and an agent of the international, and responsible for representing the international, the local, and their members. The complaint asserted that on February 13 and 14, the individuals, "contrary to their duty to plaintiff to abide by said contract, and maliciously confederating and conspiring together to cause the plaintiff expense and damage, and to induce breaches of the said contract, and to interfere with performance thereof by the said labor organizations and the affected employees, and to cause breaches thereof, individually and as officers, committeemen and agents of the said labor organizations, fomented, assisted and participated in a strike or work stoppage . . . ."

Count III of the complaint asked for an injunction but that matter need not concern us here since it is disposed of in *Sinclair Refining Co.* v. *Atkinson, ante,* p. 195, decided this day.

The defendants filed a motion to dismiss the complaint on various grounds and a motion to stay the action for the reasons (1) that all of the issues in the suit were referable to arbitration under the collective bargaining contract and (2) that important issues in the suit were also involved in certain grievances filed by employees and said to be in arbitration under the contract. The District Court denied the motion to dismiss Count I, dismissed Count II, and denied the motion to stay (187 F. Supp.

225). The Court of Appeals upheld the refusal to dismiss or stay Count I, but reversed the dismissal of Count II (290 F. 2d 312), and this Court granted certiorari (368 U. S. 937).

## I.

We have concluded that Count I should not be dismissed or stayed. Count I properly states a cause of action under § 301 and is to be governed by federal law. *Local 174* v. *Lucas Flour Co.*, 369 U. S. 95, 102–104; *Textile Workers Union* v. *Lincoln Mills*, 353 U. S. 448. Under our decisions, whether or not the company was bound to arbitrate, as well as what issues it must arbitrate, is a matter to be determined by the Court on the basis of the contract entered into by the parties. "The Congress . . . has by § 301 of the Labor Management Relations Act, assigned the courts the duty of determining whether the reluctant party has breached his promise to arbitrate. For arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." *United Steelworkers* v. *Warrior & Gulf Nav. Co.*, 363 U. S. 574, 582. See also *United Steelworkers* v. *American Mfg. Co.*, 363 U. S. 564, 570–571 (concurring opinion). We think it unquestionably clear that the contract here involved is not susceptible to a construction that the company was bound to arbitrate its claim for damages against the union for breach of the undertaking not to strike.

While it is quite obvious from other provisions of the contract [1] that the parties did not intend to commit all

---

[1] The no-strike clause (Article III) provides that "[T]here shall be no strikes . . . (1) For any cause which is or may be the subject of a grievance . . . or (2) For any other cause, except upon written notice by Union to Employer . . . ." Article XXVII, covering "general disputes," provides that disputes which are general in character or which affect a large number of employees are to be negotiated between the parties; there is no provision for arbitration. Moreover, the management-prerogative clause (Article XXXI) recognizes that "opera-

of their possible disputes and the whole scope of their relationship to the grievance and arbitration procedures established in Article XXVI,[2] that article itself is determinative of the issue in this case since it precludes arbitration boards from considering any matters other than employee grievances.[3]   After defining a grievance as "any difference regarding wages, hours or working conditions between the parties hereto or between the Employer and an employee covered by this working agreement," Article XXVI provides that the parties desire to settle employee grievances fairly and quickly and that therefore a stated procedure "must be followed."   The individual employee is required to present his grievance to his foreman, and if not satisfied there, he may take his grievance to the plant superintendent who is to render a written decision.   There

---

tion of the Employer's facilities and the direction of the working forces, including the right to hire, suspend or discharge for good and sufficient cause and pursuant to the seniority Article of this agreement, the right to relieve employees from duties because of lack of work, are among the sole prerogatives of the Employer; provided, however, that . . . such suspensions and discharges shall be subject to the grievance and arbitration clause . . . ."

[2] Article XXVI is set out in full *infra*, at p. 250, as an Appendix.

[3] We do not need to reach, therefore, the question of whether, under the contract involved here, breaches of the no-strike clause are "grievances," *i. e.*, "difference[s] regarding wages, hours or working conditions," or are "grievances" in the more general sense of the term. See *Hoover Express Co.* v. *Teamsters Local, No. 327*, 217 F. 2d 49 (C. A. 6th Cir.).   The present decision does not approve or disapprove the doctrine of the *Hoover* case or the Sixth Circuit cases following it (*e. g.*, *Vulcan-Cincinnati, Inc.*, v. *United Steelworkers*, 289 F. 2d 103; *United Auto Workers* v. *Benton Harbor Indus.*, 242 F. 2d 536).   See also cases collected in *Yale & Towne Mfg. Co.* v. *Local Lodge No. 1717*, 299 F. 2d 882, 883–884 n. 5, 6 (C. A. 3d Cir.).   In *Drake Bakeries, Inc.*, v. *Local 50, post*, p. 254, decided this day, the question of arbitrability of a damages claim for breach of a no-strike clause is considered and resolved in favor of arbitration in the presence of an agreement to arbitrate "all complaints, disputes or grievances arising between them [*i. e.*, the parties] involving . . . any act or conduct or relation between the parties."

is also provision for so-called Workmen's Committees to present grievances to the local management. If the local superintendent's decision is not acceptable, the matter is to be referred for discussion between the President of the International and the Director of Industrial Relations for the company (or their representatives), and for decision by the Director alone. If the Director's decision is disputed, then "upon request of the President or any District Director" of the international, a local arbitration board may be convened and the matter finally decided by this board.

Article XXVI then imposes the critical limitation. It is provided that local arbitration boards "shall consider only individual or local employee or local committee grievances arising under the application of the currently existing agreement." There is not a word in the grievance and arbitration article providing for the submission of grievances by the company. Instead, there is the express, flat limitation that arbitration boards should consider only employee grievances. Furthermore, the article expressly provides that arbitration may be invoked only at the option of the union. At no place in the contract does the union agree to arbitrate at the behest of the company. The company is to take its claims elsewhere, which it has now done.

The union makes a further argument for a stay. Following the strike, and both before and after the company filed its suit, 14 of the 24 individual defendants filed grievances claiming reimbursement for pay withheld by the employer. The union argues that even though the company need not arbitrate its claim for damages, it is bound to arbitrate these grievances; and the arbitrator, in the process of determining the grievants' right to reimbursement, will consider and determine issues which also underlie the company's claim for damages. Therefore, it is said that a stay of the court action is appropriate.

We are not satisfied from the record now before us, however, that any significant issue in the damage suit

will be presented to and decided by an arbitrator. The grievances filed simply claimed reimbursement for pay due employees for time spent at regular work or processing grievances. Although the record is a good deal less than clear and although no answer has been filed in this case, it would appear from the affidavits of the parties presented in connection with the motion to stay that the grievants claimed to have been disciplined as a result of the work stoppage and that they were challenging this disciplinary action. The company sharply denies in its brief in this Court that any employee was disciplined. In any event, precisely what discipline was imposed, upon what grounds it is being attacked by the grievants, and the circumstances surrounding the withholding of pay from the employees are unexplained in the record. The union's brief here states that the important issue underlying the arbitration and the suit for damages is whether the grievants instigated or participated in a work stoppage contrary to the collective bargaining contract. This the company denies and it asserts that no issue in the damage suit will be settled by arbitrating the grievances.

The District Court must decide whether the company is entitled to damages from the union for breach of contract. The arbitrator, if arbitration occurs, must award or deny reimbursement in whole or in part to all or some of the 14 employees. His award, standing alone, obviously would determine no issue in the damage suit. If he awarded reimbursement to the employees and if it could be ascertained with any assurance [4] that one of his subsidiary findings was that the 14 men had not participated in a forbidden work stoppage—the critical issue according to the union's brief—the company would nevertheless not be foreclosed in court since, even if it were

---

[4] Arbitrators generally have no obligation to give their reasons for an award. *United Steelworkers* v. *Enterprise Corp.*, 363 U. S. 593, 598; *Bernhardt* v. *Polygraphic Co.*, 350 U. S. 198, 203. The record of their proceedings is not as complete as it is in a court trial. *Ibid.*

bound by such a subsidiary finding made by the arbitrator, it would be free to prove its case in court through the conduct of other agents of the union. In this state of the record, the union has not made out its case for a stay.[5]

For the foregoing reasons, the lower courts properly denied the union's motion to dismiss Count I or stay it pending arbitration of the employer's damage claim.

## II.

We turn now to Count II of the complaint, which charged 24 individual officers and agents of the union with breach of the collective bargaining contract and tortious interference with contractual relations. The District Court held that under § 301 union officers or members cannot be held personally liable for union actions, and that therefore "suits of the nature alleged in Count II are no longer cognizable in state or federal courts." The Court of Appeals reversed, however, ruling that "Count II stated a cause of action cognizable in the courts of Indiana and, by diversity, maintainable in the District Court."

We are unable to agree with the Court of Appeals, for we are convinced that Count II is controlled by federal law and that it must be dismissed on the merits for failure to state a claim upon which relief can be granted.

---

[5] The union also argues that the preemptive doctrine of cases such as *San Diego Bldg. Trades Council* v. *Garmon*, 359 U. S. 236, is applicable and prevents the courts from asserting jurisdiction. Since this is a § 301 suit, that doctrine is inapplicable. *Local 174* v. *Lucas Flour Co.*, 369 U. S. 95, 101 n. 9.

We put aside, since it is unnecessary to reach them, the questions of whether the employer was excused from arbitrating the damage claim because it was over breach of the no-strike clause (see *Drake Bakeries, Inc.*, v. *Local 50, post*, p. 254, decided this day) and whether the underlying factual or legal determination, made by an arbitrator in the process of awarding or denying reimbursement to 14 employees, would bind either the union or the company in the latter's action for damages against the union in the District Court.

Under § 301 a suit for violation of the collective bargaining contract in either a federal or state court is governed by federal law (*Local 174* v. *Lucas Flour Co.,* 369 U. S. 95, 102–104; *Textile Workers Union* v. *Lincoln Mills,* 353 U. S. 448), and Count II on its face charges the individual defendants with a violation of the no-strike clause. After quoting verbatim the no-strike clause, Count II alleges that the 24 individual defendants "contrary to their duty to plaintiff to abide by" the contract fomented and participated in a work stoppage in violation of the no-strike clause. The union itself does not quarrel with the proposition that the relationship of the members of the bargaining unit to the employer is "governed by" the bargaining agreement entered into on their behalf by the union. It is universally accepted that the no-strike clause in a collective agreement at the very least establishes a rule of conduct or condition of employment the violation of which by employees justifies discipline or discharge (*Mastro Plastics Corp.* v. *Labor Board,* 350 U. S. 270, 280 & n. 10; *Labor Board* v. *Rockaway News Co.,* 345 U. S. 71, 80; *Labor Board* v. *Sands Mfg. Co.,* 306 U. S. 332; *Labor Board* v. *Draper Corp.,* 145 F. 2d 199 (C. A. 4th Cir.); *United Biscuit Co.* v. *Labor Board,* 128 F. 2d 771 (C. A. 7th Cir.); see *R. R. Donnelley & Sons Co.,* 5 Lab. Arb. 16; *Ford Motor Co.,* 1 Lab. Arb. 439). The conduct charged in Count II is therefore within the scope of a "violation" of the collective agreement.

As well as charging a violation of the no-strike clause by the individual defendants, Count II necessarily charges a violation of the clause by the union itself. The work stoppage alleged is the identical work stoppage for which the union is sued under Count I and the same damage is alleged as is alleged in Count I. Count II states that the individual defendants acted "as officers, committeemen and agents of the said labor organizations" in breaching

and inducing others to breach the collective bargaining contract. Count I charges the principal, and Count II charges the agents for acting on behalf of the principal. Whatever individual liability Count II alleges for the 24 individual defendants, it necessarily restates the liability of the union which is charged under Count I, since under § 301 (b) the union is liable for the acts of its agents, under familiar principles of the law of agency (see also § 301 (e)). Proof of the allegations of Count II in its present form would inevitably prove a violation of the no-strike clause by the union itself. Count II, like Count I, is thus a suit based on the union's breach of its collective bargaining contract with the employer, and therefore comes within § 301 (a). When a union breach of contract is alleged, that the plaintiff seeks to hold the agents liable instead of the principal does not bring the action outside the scope of § 301.[6]

Under any theory, therefore, the company's action is governed by the national labor relations law which Congress commanded this Court to fashion under § 301 (a). We hold that this law requires the dismissal of Count II for failure to state a claim for which relief can be granted—whether the contract violation charged is that of the union or that of the union plus the union officers and agents.

When Congress passed § 301, it declared its view that only the union was to be made to respond for union

---

[6] *Swift & Co.* v. *United Packinghouse Workers,* 177 F. Supp. 511 (D. Colo.). Contra, *Square D Co.* v. *United E., R. & M. Wkrs.,* 123 F. Supp. 776, 779–781 (E. D. Mich.). See also *Morgan Drive Away, Inc.,* v. *Teamsters Union,* 166 F. Supp. 885 (S. D. Ind.), concluding, as we do, that the complaint should be dismissed because of §§ 301 (b) and 301 (e), but for want of jurisdiction rather than on the merits. Our holding, however, is that the suit is a § 301 suit; whether there is a claim upon which relief can be granted is a separate question. See *Bell* v. *Hood,* 327 U. S. 678.

wrongs, and that the union members were not to be subject to levy. Section 301 (b) has three clauses. One makes unions suable in the courts of the United States. Another makes unions bound by the acts of their agents according to conventional principles of agency law (cf. § 301 (e)). At the same time, however, the remaining clause exempts agents and members from personal liability for judgments against the union (apparently even when the union is without assets to pay the judgment). The legislative history of § 301 (b) makes it clear that this third clause was a deeply felt congressional reaction against the *Danbury Hatters* case (*Loewe* v. *Lawlor,* 208 U. S. 274; *Lawlor* v. *Loewe,* 235 U. S. 522), and an expression of legislative determination that the aftermath (*Loewe* v. *Savings Bank of Danbury,* 236 F. 444 (C. A. 2d Cir.)) of that decision was not to be permitted to recur. In that case, an antitrust treble damage action was brought against a large number of union members, including union officers and agents, to recover from them the employer's losses in a nationwide, union-directed boycott of his hats. The union was not named as a party, nor was judgment entered against it. A large money judgment was entered, instead, against the individual defendants for participating in the plan "emanating from headquarters" (235 U. S., at 534), by knowingly authorizing and delegating authority to the union officers to do the acts involved. In the debates, Senator Ball, one of the Act's sponsors, declared that § 301, "by providing that the union may sue and be sued as a legal entity, for a violation of contract, and that liability for damages will lie against union assets only, will prevent a repetition of the Danbury Hatters case, in which many members lost their homes" (93 Cong. Rec. 5014). See also 93 Cong. Rec. 3839, 6283; S. Rep. No. 105, 80th Cong., 1st Sess. 16.

Consequently, in discharging the duty Congress imposed on us to formulate the federal law to govern

§ 301 (a) suits, we are strongly guided by and do not give a niggardly reading to § 301 (b). "We would undercut the Act and defeat its policy if we read § 301 narrowly" (*Lincoln Mills,* 353 U. S., at 456). We have already said in another context that § 301 (b) at least evidences "a congressional intention that the union as an entity, like a corporation, should in the absence of agreement be the sole source of recovery for injury inflicted by it" (*Lewis* v. *Benedict Coal Corp.,* 361 U. S. 459, 470). This policy cannot be evaded or truncated by the simple device of suing union agents or members, whether in contract or tort, or both, in a separate count or in a separate action for damages for violation of a collective bargaining contract for which damages the union itself is liable. The national labor policy requires and we hold that when a union is liable for damages for violation of the no-strike clause, its officers and members are not liable for these damages. Here, Count II, as we have said, necessarily alleges union liability but prays for damages from the union agents. Where the union has inflicted the injury it alone must pay. Count II must be dismissed.[7]

The case is remanded to the District Court for further proceedings not inconsistent with this opinion.

*It is so ordered.*

Mr. Justice Frankfurter took no part in the consideration or decision of this case.

---

[7] In reaching this conclusion, we have not ignored the argument that Count II was drafted in order to anticipate the possible union defense under Count I that the work stoppage was unauthorized by the union, and was a wildcat strike led by the 24 individual defendants acting not in behalf of the union but in their personal and nonunion capacity. The language of Count II contradicts the argument, however, and we therefore do not reach the question of whether the count would state a proper § 301 (a) claim if it charged unauthorized, individual action.

## APPENDIX TO OPINION OF THE COURT.

Article XXVI provides:

"GRIEVANCE AND ARBITRATION PROCEDURE

*"Definition*

"1. A grievance is defined to be any difference regarding wages, hours or working conditions between the parties hereto or between the Employer and an employee covered by this working agreement which might arise within any plant or within any region of operations.

*"Grievance Procedure*

"It is the sincere desire of both parties that employee grievances be settled as fairly and as quickly as possible. Therefore, when a grievance arises, the following procedure must be followed:

"2. For the purpose of adjusting employee grievances and disputes as defined above, it is agreed that any employee, individually or accompanied by his committeeman, if desired shall:

"(a) Seek direct adjustment of any grievance or dispute with the foreman under whom he is employed. Such meeting will be without loss of time to the employee and/or his committeeman during regular working hours for time spent in conference with the foreman. The foreman shall reply to said employee within three (3) working days (Saturday, Sunday and Holidays excluded) from the date on which the grievance was first presented to him;

"(b) If the question is not then settled, the employee may submit his grievance in writing, on forms supplied by Union, to a committee selected as hereinafter provided for the particular plant or region in which such employee is employed. Such committee shall investigate said complaint and if in its' opinion the grievance has merit it shall have the right to meet with 'the local company superintendent or his representative, who shall receive the committee for this purpose. Written decisions shall be made by the local superintendent or his representative within ten (10) days after meeting with the committee, provided that prior to the time of or at the meeting with the committee such complaint or grievance has been submitted in writing to the local superintendent or his representative.

"(c) In exceptional cases, Workmen's Committees shall have the right to institute grievances concerning any alleged violation of this Agreement by filing written complaint with the official locally in charge.

"(d) Any grievance filed with or by the local Workmen's Committee can only be withdrawn with the Workmen's Committee's consent.

"3. No complaint or grievance shall be considered hereunder unless it is presented to the superintendent or official locally in charge within sixty (60) days from the date on which the complaint or grievance arose, or from the date on which the employee or employees concerned first learned of the cause of complaint.

"4. The committee above mentioned shall be selected from among and by employees of the Employer who are members of the Union. No official, foreman, or employee having authority to hire or discharge men shall serve on the committee.

"5. In case of discharge or lay-off, employees who may desire to file complaints must present such complaints within one (1) week after the effective date of discharge or lay-off to the committee mentioned in this Article. Before any such employee is to be discharged for cause, other than flagrant violation of rules, or is to be laid off, he shall be given a written notice, dated and signed by his foreman or other representative of the Employer, setting forth the reason for such discharge or lay-off. In the event an employee has been discharged for a flagrant violation of a company rule, he shall subsequently, upon request, be given a written notice, dated and signed by his foreman or other representative of the Employer setting forth the reason for such discharge. The Workmen's Committee will be furnished with a copy of the statement furnished to the employee, both where the discharge or lay-off is for cause or for flagrant violation of a Company rule. Any grievance to be filed under this section must be filed within forty (40) days from the effective date of the discharge or lay-off.

"6. In the event the decision of the superintendent or his representative shall not be satisfactory to the committee, it is agreed that the President of the Oil, Chemical and Atomic Workers International Union, AFL–CIO, or someone designated by him, shall, not later than forty-five (45) days after such decision, have the right to confer with the Director of Industrial Relations for the Sinclair Companies, or someone designated by him, for the purpose of discussing grievances or disputes and of obtaining decisions thereon. It is agreed that the Director of Industrial Relations for the Sinclair Companies, or someone designated by him, shall render a decision to the President of the Oil, Chemical and Atomic Workers International Union, AFL–CIO, within twenty (20) days after grievances or disputes have been so submitted to him in writing.

"7. If such decision is not satisfactory, then, upon request of the President or any District Director of the Oil, Chemical and Atomic Workers International Union, AFL–CIO and within sixty (60) days from the posting date of the final appeal answer, there shall be set up a local Arbitration Board, and such grievances and disputes submitted to it within ten (10) days after formation of such Board. Such local boards may be set up at each refinery to deal with cases arising therefrom; cases arising from Sinclair Oil & Gas Company shall be heard and determined at Tulsa, Oklahoma; Fort Worth, Texas; Midland, Texas; or Casper, Wyoming; cases arising from Sinclair Pipe Line Company shall be heard and determined at the cities previously named or at Kansas City, Missouri; Toledo, Ohio; Houston, Texas; Chicago, Illinois; Philadelphia, Pennsylvania; or Independence, Kansas. These local Arbitration Boards shall consider only individual or local employee or local committee grievances arising under the application of the currently existing agreement, or supplements thereto, and local wage and classification disputes submitted on the initiative of the President or any District Director of the Oil, Chemical and Atomic Workers International Union, AFL–CIO. In this connection, Employer agrees to give consideration to local classification rate inequity complaints existing by reason of a comparison with the average of competitive rates of pay for like jobs having comparable duties and responsibilities being paid by agreed-upon major competitive companies in the local area. Such requests for adjustments of classification rate inequities, if any, shall be made not more frequently than twice annually, to be effective on February 1st and August 1st. Such requests to be submitted at least thirty (30) days prior to such semi-annual dates.

"8. The above mentioned local Arbitration Board shall be composed of one person designated by Employer and one designated by the President or District Director of the Oil, Chemical and Atomic Workers International Union, AFL–CIO. The board shall be requested by both parties to render a decision within seven (7) days from date of submission. Should the two members of the board selected as above provided, be unable to agree within seven (7) days, or to mutually agree upon an impartial third arbitrator, an impartial third member shall be selected within seven (7) days thereafter by the employer or employee member of the Arbitration Board, or such two parties jointly, requesting the Federal Mediation and Conciliation Service to submit a panel of arbitrators from which the third member of the board will be selected in accordance with the procedure of such Federal Mediation and Conciliation Service.

"9. The decision of the Board aforesaid, as provided in Section 8 hereof, shall be final. However, if the rules and conditions existing at the time a given case originated are subsequently changed, it is understood that the arbitration award rendered under former rules and conditions shall not act to prohibit consideration of a complaint originating under the changed rules and conditions.

"10. Cases arising from the Gasoline Plants shall be considered as coming within the Producing Division in which they are located.

"11. The fee and expense of the impartial arbitrator selected as above provided shall be divided equally between the parties to such arbitration. The Parties agree to attempt to hold the arbitrator's fees to a reasonable basis."