NATIONAL LABOR RELATIONS
BOARD, Petitioner,
v.
NATIONAL FURNITURE MANUFAC-
TURING COMPANY, Inc.,
Respondent.

No. 13775.

United States Court of Appeals
Seventh Circuit.

Feb. 15, 1963.

Rehearing Denied April 22, 1963.

Marcel Mallet-Prevost, Asst. Gen. Counsel, Melvin Pollack, Atty., Stuart Rothman, Gen. Counsel, Dominick L. Manoli, Assoc. Gen. Counsel, Peter Giesey, Atty., National Labor Relations Bd., for petitioner.

Harry P. Dees, Arthur R. Donovan, Isidor Kahn, Evansville, Ind. (Kahn,

Dees, Donovan & Kahn, Evansville, Ind., of counsel), for respondent.

Before SCHNACKENBERG, KILEY and SWYGERT, Circuit Judges.

SWYGERT, Circuit Judge.

This case is here on petition of the National Labor Relations Board for enforcement of its order directing respondent, National Furniture Manufacturing Co., Inc., of Evansville, Indiana, to cease and desist from certain unfair labor practices, and to offer reinstatement with backpay to certain discharged employees.

The case is reported at 134 NLRB 834, but we believe the significant facts, found by the trial examiner and adopted by the Board, need repetition in order to delineate the issues and give meaning to their resolution.

In a prior proceeding involving National and the charging party, Local Union No. 215, International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America, a Board trial examiner on August 16, 1960, issued an intermediate report finding that National had violated Section 8(a) (1) and (5) of the National Labor Relations Act, 29 U.S.C. § 158(a) (1) and (5), and recommended that the company be ordered to bargain with the union as the representative of its over-the-road truckdrivers at its Evansville plant, to offer reinstatement upon request to the drivers who had gone on strike in October 1959, and to cease threatening or coercively interrogating its employees concerning their organizational activities or offering inducements to them to withdraw their support of or affiliation with the union.[1] This prior proceeding provided the background for the events which ensued and which have resulted in the instant enforcement proceeding.

As an aftermath of the trial examiner's report, the union on August 26, 1960, addressed a letter to the company requesting reinstatement of the strikers. On the same day each of the striking employees wrote individual letters to the company making a similar request.

In September 1960, the six drivers who had been on strike and who are involved in the instant case (Dillback, Hughes, Crane, Dunn, Belt and Sims) were reemployed by National. When they were reemployed both the company's general manager and its personnel manager asked them not to involve company customers in "internal problems" between the company and the union. The men either acquiesced or did not indicate disagreement.

In November, 1960, Dillback, one of the reemployed strikers, was suspended for a week for violating a company rule pertaining to logbook entries. As a result the union filed a charge with the Board against National alleging that Dillback's layoff was discriminatory. National was advised on December 23, 1960, that the charge had been withdrawn by the union.

As in previous years, shortly before Christmas 1960 National laid off all employees and temporarily shut down its Evansville plant to take an inventory. The truck drivers were told they would be recalled about January 10 or 15, 1961.

Annually, there is held in Chicago a furniture exposition known as the Furniture Mart. Manufacturers, dealers, and buyers of furniture attend this Mart. National was one of the manufacturer exhibitors at the January, 1960 exposition.

On January 5, 1961, the six truck drivers involved in the instant case went to Chicago, taking with them a supply of handbills obtained from Local 215 which financed and sponsored the trip.

On Friday morning, January 6, at the pedestrian entrances to the Mart the six drivers handed out leaflets to any individual walking by who would take them. Two drivers were at each entrance. No oral appeals were made and conversation was confined to such matters as "Thank you" or "Good morning."

1. The Board on February 24, 1961, adopted the trial examiner's findings, conclusions and recommendations and issued the order.

The distribution occurred on the public sidewalk. Leaflets were not given out at truck entrances to the Mart and there is no evidence that leaflets were given to people physically carrying furniture items into the Mart.[2]

Dillback was wearing his truckdriver's uniform and cap. His cap had a badge on it that read, "National Furniture Manufacturing Company, Evansville, Indiana."

The January 6 distribution of the leaflets was without incident. On January 7, National's personnel manager, who was in Evansville, was informed by telephone about the leaflet distribution. He was told by company executives who had gone to Chicago that a letter warning the men to cease their leaflet activity was prepared or was being prepared for delivery to the six men. He was given their names. He was also told that a decision had been made to replace the leaflet distributors and was instructed to make the replacements. Thereupon, he sent telegrams to six men in Evansville assigning them as replacements for the six drivers distributing leaflets in Chicago.

The warning letter [3] was not delivered to the six drivers until the following day,

2. The leaflets which were distributed in Chicago read:

"A MESSAGE TO THE PUBLIC:

"Truck driving employees of the National Furniture Mfg. Co. at Evansville have, for over a year, waged a hard and costly battle with their employer. This is not a fight that they wanted. It was a fight forced on them by the Company. All that the men wanted was for the Company to recognize and bargain with the Union which they had freely and practically unanimously selected as their bargaining agent.

"The Company's refusal to deal with the Union, and other unfair labor practices, caused the strike which went on for many months.

"These unfair labor practices by the Company were investigated by the National Labor Relations Board. After a lengthy hearing a Trial Examiner of the Labor Board has upheld the Union's charges. Its recommended order requires that the Company shall cease and desist from:.

" '(a) Refusing to bargain collectively with (Teamsters) Local Union No. 215 * * *, as the exclusive representative of all over-the-road truck drivers at its Evansville plant * * *;

" '(b) Threatening or interrogating its employees concerning their organizational activities, or in any manner offering inducement with respect to withdrawing their support or affiliation with any labor organization.' "

"The Company has still not fulfilled the remedy which the Trial Examiner recommended. Instead, it continues its hardnosed attitude and refuses to bargain with the Union. Additional charges have been filed against the Company.

"All that the Union has ever sought is that this Company sign a Union contract which will give these drivers a living wage and decent working standards. We don't think that National Furniture is entitled to undermine the rates of fair-minded employers who are now under Union contract.

"We ask you to help these men. Only public opinion can force National Furniture to do what the government's Trial Examiner recommended. If You let the National Furniture representative know that you believe in fair play for these men, this Company might be induced to do the right thing. Your help can force this Company into Fair—rather than chiseling—competition among employers.

"Your support of these badly treated truck drivers in their hard fight for justice and their rights under the law will be deeply appreciated by Teamsters Local Union No. 215."

3. The letter referred to lists the names of Dillback, Belt, Dunn, Crane, Sims, and Hughes immediately above the salutation, "Gentlemen"; and reads:

"In our opinion what you are doing is picketing and/or striking while employees of this company.

"This is to notify you that your action as enumerated above has subjected you all and has caused this company to take the appropriate action as allowed under the National Labor Relations Act.

"This incorporated with the other acts such as sending letters to the dealers that are libelous, in our opinion is an unfair labor practice and furthermore certainly is an attempt on your part to undermind (sic) this company

Sunday, January 8. A "memorandum of suspension" was mailed to five of the six drivers on January 10. Some of the notices mentioned "your past record" as well as the recipient's activities on January 7 and 8, as reasons for the discharge.

With respect to Dillback, an eligibility report form of the Indiana Employment Security Division was mailed by National to the Division on January 10, stating:

> "Discharged—misconduct in connection with your past work as an unsatisfactory employee for which you have been disciplined. And furthermore for your current misconduct in connection with your current activities on January 7, 1961, and January 8, 1961, while you were in the employ of the company."

On January 11, 1961, National filed a charge with the Board, alleging that the union through its agents (the six drivers) had engaged in a secondary boycott in Chicago. On January 28, 1961, the company requested permission to withdraw the charge. Permission was granted and the charge withdrawn.

In the instant proceeding the trial examiner found that the leaflet distribution in Chicago was activity protected by Section 7 of the Act and that the six employees were discharged because of that activity. He ordered reinstatement and compensating backpay for each except that he declined to recommend reinstatement for Dillback. The Board adopted the report and recommendations of the trial examiner with one exception.

With one member dissenting it ordered Dillback reinstated.

National contends that the Board erred in finding that the distribution of the handbills did not amount to a secondary boycott in violation of Section 8(b) (4) (i) (B) of the Act. This section provides in substance that it is unlawful to engage in, or to induce, or encourage any individual employed by any person in commerce, etc., in the course of his employment to refuse to use goods manufactured by another where an object thereof is to force or require any person to cease using, selling, handling, transporting, or otherwise dealing in the products of any other producer or manufacturer, or to cease doing business with any other person, or to force or require any other employer to recognize or bargain with a labor organization as the representative of his employees unless such labor organization has been certified as the representative of his employees under the provisions of the Act. Primary strikes and picketing are excepted from the section as are *publicity appeals* for the purpose of truthfully advising the public, including consumers and members of a labor organization,

> "that a product or products are produced by an employer with whom the labor organization has a primary dispute and are distributed by another employer, as long as such publicity does not have an effect of inducing any individual employed by any person other than the primary

and can not be permitted by management of this concern.

"This is to notify you that while you are in the process of striking and picketing you have no right to wear the uniform of National Furniture Manufacturing Company because while on strike you have voluntarily withdrawn your services from this company. I hereby request and in fact order you to refrain from wearing the uniform of this company while you are conducting yourselves in such a fashion.

"This is to further notify you that the mere presence of each of you on

this picket line does have the effect of inducing employees of our customers to stop handling the products of the National Furniture Company and thus does constitute the coercion of the neutral employers. For this and other reasons you are being given this formal notification of our opinion so that there can be no misunderstanding of our interpretation of your conduct.

"National Furniture Mfg. Company

"(s) J. S. Mosier

"J. S. Mosier, Prod. Mgr."

employer in the course of his employment to refuse to pick up, deliver, or transport any goods, or not to perform any services, at the establishment of the employer engaged in such distribution;" See Proviso to Section 8(b) (4) of the Act, 29 U. S.C. § 158(b) (4) (1962 Supp.).

In N. L. R. B. v. Local 294 I. B. T., 298 F.2d 105 (2nd Cir., 1961), the Court analyzed the meaning of the "employed by any person" phrase and said that the phrase does not include corporate officers, high ranking supervisors and others high up in the management heirarchy.

The trial examiner concluded that the buyers attending the exposition fell within the exception established by the Second Circuit in Local 294, supra; that they were all sufficiently high in the ranks of management to be excluded from the ambit of the secondary boycott section of the Act.

We do not think that we need rest our determination that this was not a secondary boycott on the ground advanced by the trial examiner. We believe there is a more logical and sound reason.

The leaflet distributors did not station themselves at the truck entrances—a pertinent omission in view of the fact that a Teamsters' local was involved in the labor dispute. No one actually concerned with the physical handling of the furniture at the exposition was knowingly approached by the six drivers. None of the buyers were expected to pick up, deliver, or transport any goods. National was one of the exhibitors at the Mart. In effect, it had temporarily moved a part of its operations, its sales division, to Chicago. Had the leaflet distribution been conducted at the Evansville plant of National, certainly no one could say that the conduct constituted a secondary boycott. The change of locale where the distribution took place, under the circumstances, did not convert the distribution here involved into an illegal secondary boycott.

It was to potential customers of National, entering a temporary business location of the company, that the leaflets were directed. Whether the appeal for their support took place in Evansville or in Chicago at the company's temporary business site is immaterial. It is apparent that no "innocent" or "neutral" third party was threatened, coerced, or restrained, nor were neutral third parties' employees induced to refuse to pick up, deliver or transport any goods. It is highly unlikely that these leaflets would have induced the buyers to refuse to perform any services for their employers. The message contained thereon was quite clear in defining the nature of the dispute and the parties involved. It was straightforward in soliciting the readers' support for the union's objectives without threat of reprisal or force or promise of benefit. The distribution of the leaflets under these conditions falls outside the secondary boycott prohibition of Section 8 (b) (4) (i) (B).

This brings us to the crux of the case. Was National justified in discharging the six employees for distributing the leaflet in question at the Furniture Mart? In other words, was the conduct of the employees, obviously concerted activity arising out of a labor dispute, illegal, or an example of such disloyalty that we may term it "indefensible" in the sense enunciated by the United States Supreme Court in N. L. R. B. v. Local No. 1229, I. B. E. W., 346 U.S. 464, 74 S. Ct. 172, 98 L.Ed. 195 (1953)? We hold that the employees were discharged for activity protected by the Act and not for "cause" within the meaning of Section 10(c) of the Act.

In Local No. 1229 the Supreme Court held indefensible the conduct by technicians of a radio and television station in disparaging the quality of their employer's television broadcasts. The leaflets there distributed made no mention of a labor dispute and no mention of any union was included thereon. The public was not even informed that collective bargaining was involved. It was a sim-

ple act of disparagement that could only have brought harm to the employer.[4]

We find no quarrel with the cases cited by National in support of its proposition that employees while working for their employer cannot engage in boycotts or disloyal conduct towards their employer. See: Hoover Co. v. N. L. R. B., 191 F.2d 380 (6th Cir., 1951); and The Patterson-Sargent Co., 115 NLRB 1620 (1956). Suffice it to say, that the factual situations involved therein are legally distinguishable from that with which we are confronted in this case.

The Supreme Court, in Local 1229, cited the Hoover case in its opinion. It did this while demonstrating the principle that care must be exercised in determining which acts of employees are separable from activity protected by Section 7 of the Act, and hence which acts of "insubordination, disobedience or disloy-

alty," would give rise to a right in the employer to discharge its employees for cause. It was careful to point out the heavy responsibility that falls upon the Board to find the facts and apply legal principles to them in keeping with the principles underlying the Act.[5]

The trial examiner here considered all of the facts meticulously. In his intermediate report he recognized the labor dispute-publicity aspect of the leaflets. He cited this Court's decision in Jeffery-DeWitt Insulator Co. v. N. L. R. B., 91 F.2d 134, 138 (7th Cir., 1937), in determining that no strike was involved in the employees' conduct. There was no partial or total quitting of work, in fact no work was assigned during the annual shut-down period. It would also be difficult to classify the leaflet distribution in this case as picketing. We agree with the trial examiner and the Board that

---

4. The Court quoted from the Board's findings:

"* * * And their ultimate purpose—to extract a concession from the employer with respect to the terms of their employment—was lawful. That purpose, however, was undisclosed; the employees purported to speak as experts, in the interest of consumers and the public at large. They did not indicate that they sought to secure any benefit for themselves, *as employees,* by casting discredit upon their employer." (346 U.S. at 472, 74 S.Ct. at 176, 98 L.Ed. 195.)

The Court then went on to say:

"The fortuity of the coexistence of a labor dispute affords these technicians no substantial defense. While they were also union men and leaders in the labor controversy, they took pains to separate those categories. In contrast to their claims on the picket line as to the labor controversy, their handbill of August 24 omitted all reference to it. The handbill diverted attention from the labor controversy. It attacked public policies of the company which had no discernible relation to that controversy. The only connection between the handbill and the labor controversy was an ultimate and undisclosed purpose or motive on the part of some of the sponsors that, by the hoped-for financial pressure, the attack might extract from the company some future concession. A disclosure of that motive might have lost more public support for

the employees than it would have gained, for it would have given the handbill more the character of coercion than of collective bargaining. * * *"

"The Board stated *'We * * * do not decide whether the disparagement of product involved here would have justified the employees responsible for it, had it been uttered in the context of a conventional appeal for support of the union in the labor dispute.'* * * * This underscored the Board's factual conclusion that the attack of August 24 was not part of an appeal for support in the pending dispute. It was a concerted separable attack purporting to be made in the interest of the public rather than in that of the employees." (Emphasis supplied.)

5. The Supreme Court said in part:

"The above cases illustrate the responsibility that falls upon the Board to find the facts material to such decisions. The legal principle that insubordination, disobedience or disloyalty is adequate cause for discharge is plain enough. The difficulty arises in determining whether, in fact, the discharges are made because of such a separable cause or because of some other concerted activities engaged in for the purpose of collective bargaining or other mutual aid or protection which may not be adequate cause for discharge." (346 U.S. at 475, 74 S.Ct. at 178, 98 L.Ed. 195.)

the conduct complained of here was an attempt to solicit, through publicity, National's potential customers' support—moral or economic—for the labor dispute objectives of the union. There was no disparagement of National's furniture. Unlike the Local 1229 case, the labor dispute basis of the appeal was apparent to all—the union identified itself and completely revealed its purposes in so publicizing its difficulties with National. The history of respondent's labor problems lent itself to the union's desire to reinforce its organizational efforts by use of this type of publicity.

■ We recognize National's heavy reliance on the omissions and alleged misstatement of fact appearing in the leaflet. We do not believe that the union was required to note in the leaflet that the trial examiner's intermediate report and recommended order had been appealed to the Board. Such scrupulous adherence to citative formality was not required in the factual context here present; the statement was true as far as it went and the indication that the adverse decision was being appealed would have been of doubtful benefit to National.

More serious is the statement that "Additional charges have been filed against the Company." Labor unions, as well as employers, must conform to

basic "rules of the game." They are not at liberty to manufacture damaging assertions of fact. In this case, however, we are constrained to accept the trial examiner's evaluation of the alleged misstatement.[6] We do this without intending to sanction material departures from minimal standards of truthfulness to which even participants in heated labor controversies must adhere.

■ The Board adopted the proposed remedy recommended by the trial examiner except that it ordered Dillback reinstated. As a matter of remedy only, the trial examiner found that the purpose of the Act would not be effectuated by ordering National to reinstate Dillback. A complete reading of the record in this case forces us to disagree with the Board. There appears to have been a basic antagonism between Dillback and National that would preclude future harmonious relations between them. Dillback's attitude toward his employer cannot be merely written off as a conflict of personalities growing out of a disagreement as to labor policies. The trial examiner was careful to note that he sought "to establish no Pollyanna standards for the conduct of workingmen" (toward their superiors) "but merely those that are not incompatible with the normal employee-employer relationship.[7]

6. The trial examiner said:

"Aside from the plea for assistance in the leaflet and the exhortation and argumentation as to why the reader should render such help, the bulk of the leaflet purports to be a factual statement. The sentence, 'Additional charges have been filed against the Company' is pointed out by Respondent as an untrue statement. As I view this aspect, the statement is true as far as it goes but it does not tell the full story. Additional charges have been filed against the Company. They were filed on November 8, 1960 * * * The charges, however, were withdrawn on December 23, 1960.

"In reading the leaflet, the crux of the factual message is that the Company has refused to bargain and has persisted in such refusal notwithstanding recommendations by a Government agent that it has a legal obligation to do so. The reference to additional charges actually

means that the Charging Party, presumably and, in fact, the Union, believes that the Company has committed other or additional unfair labor practices. Since anyone may file a charge, the filing itself establishes nothing with respect to whether or not there has been a violation. * * * Without condoning the leaflet's failure to give the complete picture with respect to the 'additional charges' I do not regard this factor, when the leaflet is viewed as a whole, and when in fact additional charges had been filed and when the inconclusive nature of the mere filing of any charge, is borne in mind, as a misrepresentation of a material fact or one that grieviously maligned the Company."

7. Dillback's unnecessarily disrespectful attitude toward respondent's general manager in Chicago, his reckless statements to at least one customer of respondent that respondent's troubles were such that

The order of the Board will be enforced except as to the provision that requires respondent to offer reinstatement to the employee Dillback.

KILEY, Circuit Judge (concurring).

I approve of and concur in Judge SWYGERT'S opinion.

The dissent sees an implication, in the majority opinion, of a dilution of truth. Here are Judge SWYGERT'S words: "We do this without intending to sanction material departures from minimal standards of truthfulness to which even participants in heated labor controversies must adhere."

I respectfully state that these words speak differently to me than they do to Judge SCHNACKENBERG. Put another way, the words say that the authors of the majority do not approve "material departures from minimal standards of truthfulness * * *." In the context of Judge SWYGERT'S statement, it is clear that he is speaking about a fundamental legal rule governing fraud and deceit. He said it in agreeing with the trial examiner that the omission did not amount to a "misrepresentation of a material fact." There is no basis for a fear that the case at bar is being subjected to a different test of truth than any other case in this court.

The dissent presumably accepts Judge SWYGERT'S cogent reasoning that there is no secondary boycott involved here. But it says that the six men were rightly discharged because they violated the right of National to the loyalty of the men, citing National Labor Relations Board v. Electrical Workers, 346 U.S. 464, 74 S.Ct. 172, 98 L.Ed. 195 (1953). The majority opinion sufficiently distinguishes that case. There had been no hearing and no Board order against the company in that case; the employees picketed the company's station for ten days on off-hours, though drawing full pay; and the handbills "launched a vitriolic attack on the *quality* of the company's television broadcasts." (Emphasis added.)

The Supreme Court agreed that there was cause for discharge and stated what Judge SCHNACKENBERG says about employee disloyalty. The extreme conduct of the employees there was the basis for the language he quoted.

The conduct of the employees in the case at bar does not deserve the dissent's statement that "No practical person at the scene would have considered it other than a brutal effort to destroy National's business." It could be that reasonable and practical persons would view the conduct as an exercise of the right of free speech in criticizing National's labor policies; and would think that employee loyalty, on which the dissent places much weight, could hardly be expected of the six men, not rehired by National after the 1959 strike until the examiner's order was issued nearly a year later. As Justice Frankfurter said, dissenting in National Labor Relations Board v. Electrical Workers, 346 U.S. 464, 479–480, 74 S.Ct. 172, 180–181, 98 L.Ed. 195 (1953), "Many of the legally recognized tactics and weapons of labor would readily be condemned for 'disloyalty' were they employed between man and man in friendly personal relations."

For further support of the loyalty point, the dissent rests on Hoover Co. v. National Labor Relations Board, 191 F. 2d 380 (6th Cir., 1951). There, there was mass picketing, violence and a national boycott by men against their employer while drawing wages. Those facts distinguish that case.

SCHNACKENBERG, Circuit Judge (dissenting).

While proceedings were pending before the National Labor Relations Board involving National (the employer) and the union representing its employees, the usual Christmas 1960 shutdown for in-

it might go out of business, and his calling into question respondent's personnel manager's veracity and maternal ancestry on the first day of the Hearing in the

instant proceedings, render it difficult for us to judicially enforce a renewal of a relationship that bids ill for all concerned.

ventory purposes occurred. During that period the six truck drivers involved in this case, although still on National's payroll, went to Chicago with a supply of handbills, furnished by the union, which financed and sponsored the trip. According to plan, they passed these leaflets out to prospective buyers attending the annual furniture exhibit being held in Chicago, where National was displaying its products.

The opinion of this court accepts the trial examiner's charitable evaluation of a conceded misstatement contained in the leaflets.[1] Actually it is conceded that at the time of the distribution of the handbill, National's appeal to the full Board from the examiner's decision was awaiting disposition. This fact was not even mentioned in the handbill. In view of that situation, which the court recognizes, I am at a loss to understand why it feels "constrained to accept the trial examiner's evaluation of the alleged misstatement," but at the same time adds that this is "without intending to sanction material departures from minimal standards of truthfulness to which even participants in heated labor controversies must adhere." It would appear that in this court the same test as to truth and veracity should apply to all cases which come before us. That test has been adopted and applied to proceedings before the National Labor Relations Board in Allis Chalmers Mfg. Co. v. N. L. R. B., 7 Cir., 261 F.2d 613, at 616:

> " * * * If truth is diluted, it is no longer truth. A glass of pure water is no longer pure if a one-ninth part thereof is contaminated, nor is it 'virtually' pure. There cannot be 'virtually' the truth any more than there can be 'virtually' a virgin. * * * "

Viewed in its entirety, the record before us clearly presents a picture of a union's well-organized, premeditated attempt to economically destroy the business of its members' employer, rather than to wait for and abide by the results to be reached by the established legal machinery provided by the United States for the settlement of differences, which had already assumed jurisdiction of the parties. Admittedly there was no picket line, which is a standard form of protected activity. The men passing out handbills were not on strike. Even if they had been distributed on a picket line, or on a public square two or three blocks from the company's premises, in barber shops, restaurants and buses, and even though some had been mailed to business men, as in National Labor Relations Board v. Local Union No. 1229, 346 U. S. 464, 468, 74 S.Ct. 172, 98 L.Ed. 195, they were in violation of National's right to loyalty from its employees. In this case the handbills were distributed in Chicago, which is over a hundred miles from the plant where these men were employed.

The handbills distributed at the Furniture Mart demonstrated such detrimental disloyalty as to provide "cause" for the employer to discontinue in its employ the perpetrators of the attack. See National Labor Relations Board v. Local Union No. 1229, supra, where the court said, 346 U.S. at 472, 74 S.Ct. at 176, 298 L.Ed. 195:

> " * * * There is no more elemental cause for discharge of an employee than disloyalty to his employer. It is equally elemental that the Taft-Hartley Act seeks to strengthen, rather than to weaken, that cooperation, continuity of service and cordial contractual relation between employer and employee that is born of loyalty to their common enterprise.

1. The handbill stated, in part:
   "The Company's refusal to deal with the Union, and other unfair labor practices, caused the strike which went on for many months.
   "These unfair labor practices by the Company were investigated by the National Labor Relations Board. After a lengthy hearing a *Trial Examiner* of the Labor Board has upheld the Union's charges.
       \*     \*     \*     \*     \*
   "The Company has still not fulfilled the remedy which the Trial Examiner recommended. \* \* \* " (Italics supplied.)

"Congress, while safeguarding, in § 7, the right of employees to engage in 'concerted activities for the purpose of collective bargaining or other mutual aid or protection,' did not weaken the underlying contractual bonds and loyalties of employer and employee. * * *"

The majority opinion naively characterizes the handbill distribution, frankly designed to defeat National's efforts to secure business, merely as a "type of publicity". No practical person at the scene would have considered it other than a brutal effort to destroy National's business. "The fortuity of the coexistence of a labor dispute affords * * * no substantial defense." National Labor Relations Board v. Local Union No. 1229, supra, 346 U.S. at 476, 74 S.Ct. at 178–179, 98 L.Ed. 195.

In Hoover Co. v. National Labor Relations Board, 6 Cir. (1951), 191 F.2d 380, at 390, the court said:

"* * * It is a wrong done to the company for employees, while being employed and paid wages by a company, to engage in a boycott to prevent others from purchasing what their employer is engaged in selling and which is the very thing their employer is paying them to produce. An employer is not required, under the Act, to finance a boycott against himself."

In other language we came to the same conclusion in United Biscuit Co. v. N. L. R. B., 7 Cir. (1942), 128 F.2d 771, 776. This case was recently cited with approval in Atkinson v. Sinclair Refining Co., 370 U.S. 238, 246, 82 S.Ct. 1318, 8 L.Ed. 2d 462 (1962).

Because the majority opinion tolerates and sanctions proscribed disloyalty to an employer, committed contemporaneously with the pendency of a labor dispute before the Board, when it should have abhorred and condemned it, I dissent except as to the result reached in regard to the employee Dillback. Only as to the result reached as to him do I concur.