**UNITED BRICK AND CLAY WORKERS OF AMERICA and Local 790, United Brick & Clay Workers of America, Plaintiffs,**

v.

**A. P. GREEN FIRE BRICK COMPANY, Defendant.**

No. 63 C 425(1).

United States District Court
E. D. Missouri, E. D.
May 26, 1964.

James K. Cook, Schuchat, Cook & Werner, St. Louis, Mo., for plaintiffs.

James S. McClellan, Wilson, Cunningham & McClellan and Charles H. Spoehrer, St. Louis, Mo., for defendant.

HARPER, Chief Judge.

This is a suit brought by plaintiffs, United Brick and Clay Workers of America and Local 790, United Brick & Clay Workers of America (hereinafter referred to as the Union). Jurisdiction of this court rests upon Section 301 of the Labor Management Relations Act of 1947, as amended, 29 U.S.C.A. 185. The Union represents employees in an industry affecting commerce. Defendant, A. P. Green Firebrick Company (hereinafter referred to as the Company) is a business corporation organized and existing under law.

The Union seeks to compel the Company to process, and if necessary, arbitrate, grievances under a collective bargaining agreement (Plaintiffs' Exhibit 1). The Company refuses to process the Union's grievances and refuses to arbitrate the same.

The Union and Company negotiated language for a collective bargaining agreement and signed an "agreement", dated November 11, 1963. Article V of the agreement sets out the grievance procedure (see Appendix) and states basically that in the event any grievance and dispute shall not have been satisfactorily settled in the grievance procedure, "and if the issue involves the interpretation or application of provisions of this agreement" the issue shall be decided by arbitration. Paragraph 5 of Section 2 of the grievance procedure further provides the arbitrator shall not, however, have the powers to alter, disregard and/or amend any of the provisions of this agreement. Sections 1, 2 and 3 of Article VI (see Appendix) labeled "Hours of Work", are interpreted by the Union as requiring the Company to pay overtime rates to Saturday workers, which the Company refuses to do, and further, the Company refuses to process the grievance or submit the same to arbitration.

The Company admits that it signed the agreement, but denies that the agreement constitutes a *valid* contract or agreement between the Company and the Union. The Company requests that the signed agreement be adjudged of no force or effect and that plaintiffs' prayer for relief be denied.

The facts of this cause are undisputed. The main plant of the Company is in Mexico, Missouri, where the Company was founded over fifty years ago. Prior to 1963 the Company's employees at its Mexico plant were not represented by any union. On July 24, 1963, subsequent to the Company's employees electing to be represented by the Union, negotiation of a labor contract was commenced. The negotiations were concluded on November 5, 1963. There were approximately eleven negotiation meetings in total. The matters discussed covered the full range of subjects normally included in a labor contract.

In the negotiations the Company was represented by a committee composed of George Sullivan, Vice-President and Director of Industrial Relations; Ferris Munday, Director of Operations; L. B. Hawthorne, Jr., Personnel Manager; and

Charles H. Spoehrer, St. Louis attorney and representative of the Company in labor relations. The Union was represented by its negotiating committee, composed of William Power, President of the Local 790; Otis Shelton, Vice-President; William Powell, Financial Secretary; Donald Shay, Recording Secretary; and Raymond Dollens, Treasurer. These men are long-time employees of the Company. The international union was represented by Messrs. Harold Flegal, Ollie Messer, Ed McKay and Willie Bryant.

The Company had in effect in certain of its departments in its plant at Mexico, Missouri, a six-day work week, Monday through Saturday. Employees in these departments work five of the six days. The work shifts are rotated so that each employee works approximately the same number of Saturdays. This practice has been in effect for more than thirty years. No overtime or premium pay has ever been given for the Saturday work, unless an employee worked in excess of forty hours per week or eight hours per day. The members of the Union negotiating committee were aware of the Company's practice in this work scheduling and that the Company never gave premium pay for the Saturday work. This practice was never questioned or mentioned by either the Union or the Company throughout the entire period of negotiations.

Discussion took place during the negotiations concerning Sections 1 and 2 of Article VI. Several changes were made to the initial draft first submitted by the Union. First, the sentence providing for the payment of double time for the seventh consecutive day worked in the work week was moved from Section 2 to Section 1. Second, the sentence excepting prospecting employees was added to Section 1. Third, the sentence providing that the definitions of the work week and the work day should not apply to continuous operations was added to Section 2. The court finds that these changes have little or no bearing on the questions before it.

Final agreement on all the terms of the agreement was reached on November 5, 1963; the Company had copies of the agreement, dated November 11, 1963, typed up and copies delivered to the Union. The Union had a meeting on Sunday, November 10, 1963, or Monday, November 11, 1963, where the membership voted to ratify the agreement. However, a question arose at the meeting concerning the interpretation of Article VI. The international union's representative informed the meeting that Article VI meant that the workers in the departments affected by the Company's work scheduling practice would be paid time and one-half for work performed on Saturday when it constitutes the fifth day work in the week, even though the total hours worked in the week do not exceed forty. Several local Union men, including William Power, were of the opposite opinion.

On November 11, 1963, subsequent to the Union meeting, Power brought copies of the agreement to George Sullivan, Vice-President and Director of the Company's industrial relations, which had been executed by the Union. Sullivan signed ten copies of the agreement. Power then asked Sullivan what he thought Sections 1 and 2 of Article VI meant. Power then told Sullivan of the interpretation question discussed at the Union meeting.

Between November 12, 1963, and November 14, 1963, Mr. Spoehrer, the Company's lawyer, contacted the international union to inquire about their interpretation of Article VI and to express the Company's disagreement with the Union's interpretation. On November 14, 1963, the Company sent a telegram (Defendant's Exhibit A) to the Union's international representatives which plainly indicated that the Company took the position that the Company and the Union had not reached a meeting of minds and that there was no agreement or contract between them if the Union understood the contract to require premium pay for Saturday work. The Union replied that it deemed the contract to be a valid one and that if the Company had some question

concerning interpretation of any clause it should be handled through the grievance procedure set forth in Article V of the agreement.

The matter of whether or not premium pay is given for Saturday work is highly important to the Company. If the Company were required to give premium pay for the work done on Saturday, in accordance with the Union's contention, the additional annual wage costs would be between $100,000.00 and $145,000.00. The Company cannot discontinue the practice of scheduling of production over a six-day week.

Several recent United States Supreme Court cases have involved the enforcement of arbitration provisions in collective bargaining agreements. United Steelworkers of America v. Warrior & Gulf Navig. Co., 363 U.S. 574, 80 S.Ct. 1347, 4 L.Ed.2d 1409; United Steelworkers of America v. American Mfg. Co., 363 U.S. 564, 80 S.Ct. 1343, 4 L.Ed.2d 1403; United Steelworkers of America v. Enterprise Wheel & Car Corp., 363 U.S. 593, 80 S.Ct. 1358, 4 L.Ed.2d 1424; Atkinson v. Sinclair Refining Co., 370 U.S. 238, 82 S. Ct. 1318, 8 L.Ed.2d 462; Drake Bakeries, Inc. v. Local 50, 370 U.S. 254, 82 S.Ct. 1346, 8 L.Ed.2d 474. (See also Builders Assoc. v. Greater Kansas City Laborers, 326 F.2d 867 (8th Cir. 1964).

A study of these cases clearly shows that the role of the judiciary in a proceeding involving the enforcement of an arbitration provision is limited to determining whether the parties have agreed in their collective bargaining to arbitrate the particular dispute, grievance or difference. The Supreme Court in United Steelworkers v. American Mfg. Co., supra, 363 U.S. l.c. 570, 80 S.Ct. l. c. 1364, said:

"To be sure, since arbitration is a creature of contract, a court must always inquire, when a party seeks to invoke its aid to force a reluctant party to the arbitration table, whether the parties have agreed to arbitrate the particular dispute. In this sense, the question of whether a dispute is 'arbitrable' is inescapably for the court."

It is the promise to arbitrate the particular dispute made in the collective bargaining agreement that the court will enforce and its existence must be determined before the reluctant party (The Company in this case) can be required to submit to arbitration. When the basis of a dispute appears to contain both arbitrable and non-arbitrable matters, doubts as to its coverage under the arbitration clause are to be resolved in favor of arbitration.

The Union contends that the Company must arbitrate the dispute involving the scheduling of workers and whether Saturday workers should be paid overtime wages. The Union contends that the Company must arbitrate for two reasons. First, the arbitration clause in the agreement requires arbitration when the dispute involves the interpretation or application of the collective bargaining agreement. Second, the dispute in this case does involve the interpretation of Article VI, Sections 1, 2 and 3 of the agreement.

There is no doubt that the Supreme Court does generally favor arbitration. In United Steelworkers of America v. Warrior & Gulf Navig. Co., supra, the court indicated that an order to arbitrate should not be denied unless it is positive that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute. Absent an express provision excluding a particular grievance from arbitration, only the most forceful evidence of a purpose to exclude the claim from arbitration can prevail.

In the present case, it is clear that the Company never agreed to arbitrate the present dispute. The law is clear that "arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." United Steelworkers of America v. Warrior & Gulf, supra, 363 U.S. l. c. 582, 80 S.Ct. l. c. 1353.

Although overtime and premium pay was discussed at length during the negotiations of the contract, neither the Company nor the Union discussed or negotiated the question of overtime wages for Saturday workers. All the evidence shows that the Company and Union never contracted to submit the disputed question to arbitration. The Company undisputably had never paid overtime wages to Saturday workers based solely on Saturday work, and the Union negotiating committee knew this at the time the negotiation meetings were taking place. The question involves such an important phase of the plant operation that the Company would surely have fought a Union proposal to pay overtime to Saturday workers. These facts strongly indicate that the Union and the Company never contracted to submit to arbitrate the question.

The court understands the law to be that if contract terms are clear, certain and definite, then its provisions are binding and controlling and are to be accepted without reference to any rules of interpretation, because courts are without right to make a contract for the parties different from the one they actually made. Eastmount Const. Co. v. Transport Mfg. & Equip. Co., 301 F.2d 34, 39 (8th Cir. 1962).

There is nothing in the agreement to indicate that the Company contracted to arbitrate the question of overtime pay to Saturday workers. The grievance procedure (Article VI) is rather sketchy and not too clear, particularly when compared with grievance procedures authorized in such cases as Atkinson v. Sinclair Refining Co., 370 U.S. 238, 250, 82 S.Ct. 1318, 8 L.Ed.2d 462. Hours of work (Article VI) supports the testimony that overtime and premium pay was discussed and inserted in the contract. The section plainly sets out when each are paid and there is no reference to premium pay or overtime for Saturday work as such. In the agreement, the court finds nothing that indicates that the Company agreed to arbitrate the question. If there is doubt because of obscurity or ambiguity, then looking at the extrinsic evidence, as discussed, supra, it is evident that there was no intention to arbitrate the question.

As a matter of law and policy, the court is convinced that in a situation such as the one before us, a party to a collective bargaining agreement should not be forced to arbitrate something which was never discussed during contract negotiations and quite obviously was by-passed by both parties to the agreement. The court does not base its opinion on the secret specific intentions of either party, but looks at the written agreement as a reasonably prudent man acquainted with all the circumstances surrounding the making of the contract. The court holds that the parties did not contract to submit the question of overtime wages for Saturday workers to arbitration and that, therefore, the defendant Company does not have to arbitrate the same.

With respect to the contract itself, it is a good and valid contract, but under the contract the dispute regarding premium pay for Saturday work is not subject to arbitration under the terms of the contract.

This memorandum opinion is adopted as the findings of fact and conclusions of law and the attorney for the defendant will prepare the proper judgment and submit to the court for entry.

### APPENDIX

Article V and VI provide:

#### "ARTICLE V

#### "Grievance Procedure

"Section 1. The Company shall deal with a committee of not more than five (5) persons elected from among the employees which shall be known as the Grievance Committee.

"Section 2. The Grievance Committee shall meet with Management and make an earnest effort to adjust all grievances and disputes arising between the Company and the Union during the life of this agreement and when a joint decision is reached at any stage of the procedure,

such decision shall be reduced in writing, signed by both parties, and thereafter be binding on both parties in the case, and the case may not be reopened except by mutual agreement. All grievances and disputes shall be handled in the following order:

"*First*: The individual or individuals concerned in the grievance or dispute may, with the Committeeman or Steward, take the matter up with the Department Foreman for settlement within five (5) working days after the alleged occurrence, and if they fail to agree;

"*Second*: The Grievance Committee shall take the matter up with the Operating Superintendent and shall reduce the grievance to writing. If the grievance is settled by the Committee and Superintendent, the minutes of the meeting shall set out the conditions of the settlement and be signed by both parties; if not settled, the minutes shall show the status of the case and be signed by both parties.

"*Third*: A district or International Representative of the Union shall be called in to try to adjust the matter between the Committee and the Manager of Operations, or the Director of Research in the case of Laboratory employees; and

"*Fourth*: It·shall be reviewed by a District of International Representative of the Union with the Grievance Committee and the Vice-President of the Company for Industrial Relations with the Company's Labor Relations Counsel;

"*Fifth*: In the event the case shall not then have been satisfactorily settled, and if the issue involves the interpretation or application of the provisions of this agreement, notice of intent to appeal the case to an arbitrator must be given to the other party within ten (10) days. If the parties fail to agree on the selection of an arbitrator within ten (10) days of the notice, either party may request the Federal Mediation and Conciliation Service to nominate a panel of five (5) arbitrators from whom one will be selected by each party alternately striking a name from the list, commencing with the party seeking arbitration. The last name remaining shall be deemed jointly chosen by the parties as the arbitrator. The arbitrator shall not, however, have the power to alter, disregard or amend any of the provisions of this agreement.

"*Section 3*. Any employee unjustly suspended or discharged shall be reinstated with full seniority; pay for the time lost shall be left to the discretion of the parties hereto, or the arbitrator. A suspension or discharge case must be brought to the attention of the Company in writing within five (5) working days from the date of the suspension or discharge; and if the case is not disposed of within ten (10) days from the date of the suspension or discharge, such case shall be submitted to arbitration as provided above, provided the request for arbitration is served on the Company within fifteen (15) days of the date of the suspension or discharge.

"*Section 4*. Any fee, salary or expense incident to the services of an arbitrator acting pursuant to this agreement shall be chargeable equally to the Company and the Union. The decision of the arbitrator shall be final and binding on all parties to the agreement and the employees involved.

## "ARTICLE VI
### "Hours of Work

"*Section 1*. Eight (8) hours shall constitute a regular day's work and forty (40) hours a regular week's work, but this shall not be construed as a guarantee of hours of work in any one day or any one week. Time and one-half shall be paid for all work done in excess of eight (8) hours per day or in excess of forty (40) hours per week. Double time shall be paid for the seventh consecutive day worked in the work week. Overtime shall not be pyramided. Exception to the

foregoing overtime provisions is noted in the case of Prospecting employees.

"*Section 2.* A day is a continuous 24-hour period beginning at the regular starting time of the employee's shift. A work week is a seven (7) consecutive day period beginning at 6:01 A.M. Monday. This provision shall not apply to continuous operations.

"*Section 3.* Janitorial employees shall not be covered by Sections 1 and 2 of this Article but shall be paid time and one-half for all work in excess of eight (8) hours in any 24-hour period or in excess of forty (40) hours per week, but not for both.

"However, the Company reserves the right to schedule the work hours of such employees on a split-shift basis.

"*Section 4.* Employees reporting to work as regularly scheduled not having been notified not to report, shall be given four (4) hours of work in a work day in a department in which work is available and they shall be paid their regular rate of pay for such work (or the rate of the job to which transferred, if higher), but in the event employees so reporting are unable to perform the work because of conditions beyond the Company's control, or if they fail to work, the above provision shall not apply.

"Employees called out for work at times other than their regular scheduled work hours shall be paid a minimum of four (4) hours of straight-time pay at their regular rate of pay or the rate of the job to which assigned, if higher.

"An exception to the 4-hour minimum call-out provisions in this Section is noted in the case of Laboratory Technicians when performing pre-arranged tests at times outside of regular work-hours, who, under those circumstances, will be paid only for the time spent at such work at the applicable overtime rate but in no event will they be paid for such work less than a minimum of two (2) hours of straight-time pay.

"*Section 5. Sunday Premium for Non-Overtime Hours*: For all time worked on Sunday which is not paid for on an overtime basis, a premium of 25% based on the regular rate shall be paid. For the purpose of this provision, Sunday shall be deemed to be the 24 hours beginning with the shift change time nearest to 6:01 A.M., Sunday."