**GARLAND COAL & MINING COMPANY, Plaintiff,**

v.

**UNITED MINE WORKERS OF AMERICA; District 21, UMWA; Local 1285, UMWA; Local 1329, UMWA; Local 2071, UMWA; Local 2428, UMWA, Defendants.**

**Civ. No. 83–2188.**

United States District Court, W.D. Arkansas, Fort Smith Division.

Oct. 10, 1984.

William C. Nulton, Richard W. Noble, Shughart, Thomson & Kilroy, Kansas City, Mo., and J. Michael Shaw, Shaw & Ledbetter, Fort Smith, Ark., for plaintiff.

Michael Holland, Willard P. Owens, A. Randall Vehar, United Mine Workers of America, Washington, D.C., and Betsy Hall, Hardin, Jesson & Dawson, Fort Smith, Ark., for defendants.

## MEMORANDUM OPINION

H. FRANKLIN WATERS, Chief Judge.

This case results from a long, drawn-out, unfortunate, and sometimes violent dispute between Garland Coal & Mining Company and the United Mine Workers of America and various of its affiliated locals. The specific portion of the dispute involved in this case seems to be merely a small "crumb" of a much larger dispute that has been going on since early 1981, resulting in several lawsuits in various federal courts and multiple disputes pending before the National Labor Relations Board. The court has jurisdiction of the subject matter under the provisions of 29 U.S.C. § 185 and 28 U.S.C. § 2201.

As the court stated to the lawyers on the record during the trial of this case, like the overall dispute between the parties, this case seems to have "gotten out of hand." Perhaps this is the fault of the court in not taking control of the case early on as contemplated by Rule 16(c), but, for whatever reason, the court is convinced that the attorneys in this case have "built a file" which far exceeds what would be justified by the issues. The "papers filed" are included in a court file that is approximately two feet thick, and during the course of the trial, the parties constantly had conflicts relative to very extensive discovery that was engaged in. These conflicts cause the court to wonder if the parties were proceeding in the manner in which Professor Arthur Miller describes the present state of federal discovery. At an address at the Workshop for Judges of the Eighth and Tenth Circuits in Phoenix, Arizona, on January 20, 1984, Professor Miller described federal discovery engaged in by many attorneys to be like an oldtime dance contest (as in the movie "They Shoot Horses Don't They?") in which the object is to go on the dance floor with your partner and wander about the floor, swaying aimlessly to the music, until you and your partner (your client) are the last couple left standing. When that occurs, you win.

As indicated, the court will take the blame for the matter "getting out of hand," because one of its jobs is to prevent that from occurring, but feels that it is appropriate for it to express its concern about the procedures followed in this case in the hope that it might help prevent this from occurring in the future. The court will certainly attempt to keep it from occurring again.

Although it takes a considerable length of time to sift through the papers to determine that this is the case, this is simply a declaratory judgment action filed by Garland pursuant to the provisions of 28 U.S.C. § 2201 asking that the court declare that it is not obligated to arbitrate certain grievances specified in the complaint, and seeking an injunction against the defendants enjoining them from taking any action to require the plaintiff to arbitrate the grievances. In its initial complaint, it attached seven grievances which it claims arose after the expiration of the collective bargaining agreement between the parties, and it sought only a declaratory judgment by the court that it was not obligated to arbitrate these grievances. After numerous motions were filed and disposed of, among which was the Union's contention that Garland had not sued all of the real parties in interest, Garland, after obtaining leave of the court, amended its complaint bringing into the lawsuit five specified local affiliates of the UMWA. Attached to the amended complaint were eleven grievances about which it sought a declaratory judgment, including the seven attached to its initial complaint and four additional ones. In Count I of the amended complaint, it requested that the court enter a declaratory judgment that it was not obligated to arbitrate the eleven grievances which it claims arose after the expiration of the collective bargaining agreement, and again prayed for an injunction in this respect. Unlike Count I which requested the court act only in relation to specified grievances, Count II asks the court to declare "that Plaintiff is not obligated to arbitrate grievances after the expiration of the said agreement" and for an injunction prohibiting the Union from taking action, apparently in any forum, to require arbitration of such grievances.

After the amended complaint was filed, the Union responded and, without leave of the court, filed a counterclaim against Garland Coal & Mining Company, and third-party complaints against two additional companies, Toltec Coal Company and Great Western Enterprises, Inc., to which it claimed Garland had sold certain of its assets, claiming that Garland, Great Western and Toltec "constitute a single integrated business enterprise as a 'single employer,' as that term is understood under the federal labor laws." The counterclaim and third-party complaint add substantial additional issues to the lawsuit, and the court, by telephone conference, advised that the

pleading would not be allowed because leave of the court had not been obtained, because it would substantially change the nature of the lawsuit and because the issues contained in it were not timely raised since the matter was on the trial docket and scheduled for trial at the time. Apparently the court inadvertently failed to enter a written order to that effect at that time.

After numerous motions, briefs, responses, responses to responses, replies, replies to replies, and a myriad of filings in relation to discovery disputes had been filed by the parties, and after the discovery disputes had been referred to Magistrate Ned A. Stewart, Jr., for disposition, the case was tried to the court on September 17 and 18, 1984.

From the evidence received at the trial, it is clear that Garland, with its principal offices in Fort Smith, Arkansas, was, at least prior to the dispute which resulted in this lawsuit and other lawsuits occurred, in the business of mining coal at four locations in Western Arkansas and Eastern Oklahoma. While this matter was pending, a petition was filed by the Trustees of the "United Mine Workers of America 1950 Benefit Plan and Trust" seeking an order placing Garland in involuntary bankruptcy. A stay order was entered, and all parties agree that such stay would prohibit the parties from pursuing the counterclaim (and, in fact, the third-party complaints) so long as it is in effect, even if they had been permitted.

The evidence is clear that although it was not technically a signatory to the National Bituminous Coal Wage Agreement of 1978 negotiated by the UMWA and the Bituminous Coal Operators' Association, it executed an identical agreement with the UMWA and the various locals representing the workers employed by it.

The agreement became effective on March 27, 1978, and was for a period of three years from the effective date. Article XXIX provided that either of the parties could terminate the agreement on or after March 27, 1981, by giving at least 60 days written notice to the other party of such desired termination date. On January 12, 1981, the UMWA, by mailgram dated that date, notified Garland that "pursuant to Section 8(d) of the National Labor Relations Act and Article XXIX of the National Bituminous Coal Wage Agreement of 1978, the United Mine Workers of America hereby formally notifies you of our intention to terminate this agreement effective March 27, 1981." Garland also received a "Memorandum," signed by President Sam Church, Jr., to that effect. This letter was received as Plaintiff's Exhibit B.

The court finds that it would serve no useful purpose to delineate in any detail the "labor strife" that has evolved as a result of the dispute between the parties. Suffice it to say that, while the parties attempted to negotiate a new contract for several months after the termination of the 1978 agreement, no agreement was reached and the plaintiff's employees, represented by the UMWA, immediately struck and picketed plaintiff's establishments. Plaintiff hired replacement workers, which resulted in a considerable amount of strife, resulting in one or more bombings or other acts of vandalism by unknown persons. In fact, the workers at the Tamaha mine in Oklahoma engaged in a wildcat strike beginning on March 21, 1981, six days before the contract terminated, and were "fired" by management on March 26, 1981. Since that time, numerous confrontations have occurred between representatives of management and of the UMWA and no progress has been made toward a settlement during the more than three years since termination of the collective bargaining agreement. As indicated, the file indicates that numerous lawsuits have been filed by the parties in various courts, and the dispute has resulted in the filing of various charges with the National Labor Relations Board. The disputes which exist in this lawsuit as well as numerous other ones involving other disputes between the parties are now pending in NLRB Consolidated Case Nos. 16–CA–9839 and 16–CA–10442.

Since that is the case, and since the court, as indicated, is convinced that this case involves only a very small portion of the dispute between the parties, and will, in reality, settle little if anything, the court is sorely tempted to exercise the discretion granted to it by 28 U.S.C. § 2201 and Rule 57 of the Federal Rules of Civil Procedure, and decline to enter any judgment in this case. The court is convinced that anything that it does in this case will not end the strife and get the mines back in operation and the workers back to work and will not, to any degree whatsoever, bring the parties any closer to an agreement and all of this any closer to an end.

Irrespective of how the court rules, the mines will, more than likely, continue to be inoperable because of the strife, the workers will still be on strike, and the parties will continue to litigate this matter in numerous forums. If the court decides this small part of the controversy, the losing side will undoubtedly appeal to the Court of Appeals, the bankruptcy petition will still be pending, and, at best, a great deal of the controversy will still have to be resolved before the NLRB. The court and, indeed, the parties will appear to have accomplished little, if anything. The large attorneys' fees and other expenses that seem to have been generated in this case will undoubtedly continue in other forums, and what the court does in this case would seem to have little chance of stemming, to any substantial degree, the tide that appears to endlessly roll on.

■ As the discussion in Wright, Miller & Kane, *Federal Practice and Procedure: Civil 2d* § 2759 at 646, points out, courts are given a great deal of discretion in determining when to exercise the declaratory judgment jurisdiction granted by 28 U.S.C. § 2201. That article, and the numerous cases cited in it, indicate that a court should generally decline to exercise its jurisdiction to grant declaratory judgments if it will serve no purpose and will not settle the differences between the parties.

The court, as indicated, simply does not believe that it will accomplish much, if anything, by rendering a decision in this case. However, even though it is sorely tempted to leave the parties where it finds them, it simply cannot bring itself to do so in this case, in view of the substantial expenses that have obviously been involved and the great deal of time already expended by the parties, their attorneys, and the court and its staff. The court recognizes that a great deal of the expense incurred would, undoubtedly, have been incurred anyway because of the controversies pending in other forums. In other words, the court believes that some of the discovery and other "attorney work product" was developed because of the overall controversy, and not simply in an attempt to litigate the claims in this case.

Be that as it may, the court feels compelled to give the parties and the public "something for their money" even if it will quite obviously not be worth what it costs.

As indicated, the amended complaint filed in this case by Garland asks the court to enter a declaratory judgment in relation to certain grievances filed by or in behalf of its former employees. The complaint breaks these grievances into two types. The first type, set forth in Count I of the amended complaint, is those grievances which are over disputes and differences which arose after March 27, 1981, the date of termination of the contract, and which were not filed until after that date. These grievances were attached as exhibits to the amended complaint and were received in evidence as Plaintiff's Exhibits L, M, N, R, S, T, V, W, X and Y. The remaining grievances which the plaintiff attempted to cover in Count II of its amended complaint are either those which were caused by disputes or differences which arose before March 27, 1981, and which were filed before that date (Plaintiff's Ex. D—K) or those which arose before March 27, 1981, but were not filed until after that date (Plaintiff's Ex. O—Q and Ex. U). The court has concluded that, for the reasons set forth below, it will grant the relief requested in Count I of the amended complaint, and deny that requested in Count II.

Both parties recognize that this case is controlled by the holding of the United States Supreme Court in *Nolde Bros., Inc. v. Local No. 358, Bakery & Confectionery Workers,* 430 U.S. 243, 97 S.Ct. 1067, 51 L.Ed.2d 300 (1977). However, saying that does not, by any means, settle the question. Shortly after *Nolde* was handed down, University of Kansas Professor of Law Raymond Getts, writing in 63 Va.L.Rev. 693 (June 1977), attempted to explain what the court said in *Nolde* in some 37 pages, and largely concluded that it was difficult to say what *Nolde* means. In spite of this, the court will apply *Nolde, supra,* as it understands it, because it is unquestionably its duty to do so.

## GRIEVANCES ARISING AFTER MARCH 27, 1981

The court concludes that the employer has no contractual duty to arbitrate those grievances which arose and were filed after March 27, 1981, the date of termination of the contract. In *Nolde, supra,* the Supreme Court was faced with the question of whether the employer in that case was obligated to arbitrate grievances involving a severance pay claim which arose under the terms of the contract, but which was not filed until after it had terminated. The employer argued, as does the employer in this case, that the duty to arbitrate arises solely by contract, and that once the contract has terminated there can naturally be no duty to arbitrate since the parties are no longer bound by the contract which set up the arbitration procedure. While logic seems, at least on the surface, to dictate this result, that is not necessarily the result that *Nolde* reached. The Court recognized that, as the employer argued, "Arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." *Steelworkers v. Warrior & Gulf Nav. Co.,* 363 U.S. 574, 582, 80 S.Ct. 1347, 1353, 4 L.Ed.2d 1409 (1980); *e.g., Gateway Coal Co. v. Mineworkers,* 414 U.S. 368, 374, 94 S.Ct. 629, 635, 38 L.Ed.2d 583 (1974); *John Wiley & Sons v. Livingston,* 376 U.S. 543, 547, 84 S.Ct. 909, 913, 11 L.Ed.2d 898 (1964); and *Atkinson v. Sinclair Refining Co.,* 370 U.S. 238, 241, 82 S.Ct. 1318, 1320, 8 L.Ed.2d 462 (1962).

The Court then goes on to say:

Our prior decisions have indeed held that the arbitration duty is a creature of the collective-bargaining agreement and that a party cannot be compelled to arbitrate any matter in the absence of a contractual obligation to do so. Adherence to these principles, however, does not require us to hold that termination of a collective-bargaining agreement automatically extinguishes a party's duty to arbitrate grievances arising under the contract. 430 U.S. at 250, 97 S.Ct. at 1071.

The Court then goes on to say that the parties could have intended that the arbitration procedure developed in the contract would survive its termination, and, based upon the contract before it, there was no indication that this is not what the parties intended. The Court said:

However, even though the parties could have so provided, there is nothing in the arbitration clause that expressly excludes from its operation a dispute which arises under the contract, but which is based on events that occur after its termination. 430 U.S., at 253, 97 S.Ct. at 1072–1073.

The Court then discusses the policy created by federal labor law favoring arbitration, and cases such as *Warrior & Gulf, supra,* enforcing this policy, and concludes:

In short, where the dispute is over a provision of the expired agreement, the presumption favoring arbitrability must be negated expressly or by clear implication. 430 U.S. at 255, 97 S.Ct. at 1074.

Thus, it appears clear that before this court can declare that any of the grievances which are the subject matter of this dispute are not arbitrable, it must find from the contract and the actions of the parties that arbitrability is "negated expressly or by clear implication." Although the court admits that this is a difficult burden, it finds that the presumption created by *Nolde* is, by the action of the parties

and the contents of the contract, negated by clear implication.

The 1978 National Bituminous Coal Wage Agreement is but one of a succession of agreements that have been entered into by the UMWA and employers engaged in the mining industry. The parties introduced the 1974 agreement as Joint Exhibit 5. Many provisions of these two agreements are almost identical, including those establishing a grievance procedure. The grievance procedure is established in both documents by the provisions of Article XXIII, Section (c), and both apply only to "disputes arising under this Agreement." However, unlike the 1974 agreement, the drafters of the 1978 agreement recognized the need for a provision providing for the handling of grievances which occurred during the term of the 1974 agreement, but which had not been resolved by the time that the 1978 agreement took effect. Article XXIII, Section (k), of the 1978 agreement provides:

> Any dispute and/or difference which as of the effective date of this Agreement is in the process of adjustment under the Settlement of Disputes section of the prior Agreement or any dispute and/or difference presented on or after the effective date of this Agreement which is based on the occurrence or nonoccurrence of an event which arose prior to the effective date of this Agreement shall be processed under the procedural provisions of this Agreement and shall be resolved under the applicable provisions of the prior Agreement. Decisions reached under this provision shall be final and binding and not subject to appeal to the Arbitration Review Board. Cases appealed under the provisions of the National Bituminous Coal Wage Agreement of 1974, resolved by the Arbitration Review Board after the expiration of that Agreement, shall not constitute a precedent under this Agreement.

One of the bases for the holding in *Nolde, supra,* was that the Court deemed that the parties must have been conscious of the national policy favoring arbitration and

> [c]onsequently, the parties' failure to exclude from arbitrability contract disputes arising after termination, far from manifesting an intent to have arbitration obligations cease with the agreement, affords a basis for concluding that they intended to arbitrate all grievances arising out of the contractual relationship.

That inference is not present in this case. In drafting the 1978 agreement, the parties did not simply ignore the possibility that there would be grievances which arose under the prior agreement which would not have become effective by the time that it terminated. Instead, they placed in the agreement Article XXIII, Section (k), which specifically provided how grievances arising under the 1974 contract would be handled. In the court's view, there could have been no other reason for the inclusion of this provision other than that the parties recognized and, in effect, agreed, that the obligation to arbitrate ended with the termination of the 1974 agreement. They specifically agreed that even though that was the case, the duty to arbitrate would not end, and they provided for it. This, in the court's view, certainly is an indication that the parties, by clear implication, recognized that the termination of a National Bituminous Coal Wage Agreement terminated the obligations of the parties to arbitrate grievances arising under the old agreement. What other purpose could Article XXIII, Section (k), have had?

The evidence in this case shows, almost without contradiction, that not only had the parties negotiated this provision in the 1978 agreement, the parties attempted to negotiate a new agreement, and the Union insisted that a provision like that contained in Article XXIII, Section (k), of the 1978 agreement be included in the new agreement. During these negotiations, the Union submitted a proposal for a provision in the new contract which would have been identical to this provision of the 1978 agreement. Again, since that is true, what other purpose could that have had other than to

attempt to take care of grievance matters which the parties recognized were not covered under the 1978 agreement after it expired? The fact that this provision was submitted for negotiation and apparently discussed by the parties, is further evidence, in the court's view, that both of the parties recognized and understood the duty to arbitrate ceased upon expiration of the 1978 agreement.

Further, Article XXIII, Section (b)(1), of the 1978 agreement provides that the arbitrators "shall serve for the duration of this agreement . . . ." Again, the court believes that this is ample evidence that the parties believed and intended that the term of the arbitrators would cease upon the expiration of the agreement. Since that is true, it appears to be clear that the parties must have also intended that the obligation to arbitrate ceased with the termination of the agreement since they did not provide for arbitrators after that date. The National Labor Relations Board, the body that has been designated by Congress to apply the national labor laws, has, in an almost identical situation, so held. In *S & W Motor Lines, Inc.*, 236 N.L.R.B. 938, 949–50 (1978), the board found that the *Nolde Bros.* presumption was negated because of a provision in the collective bargaining agreement which appointed the arbitration committee to serve "during the term of this contract agreement."

Just as it had done in relation to Article XXIII, Section (k), the Union, during negotiations for a new contract submitted a proposal, Article XXIII, Section (b), which would have provided: "Arbitrators appointed under the prior agreement shall serve as district arbitrators until arbitrators can be selected." Again, the court finds the implication to be clear. The Union recognized that there was no contractual authority for the arbitrators to serve after the expiration of the agreement. The Union obviously believed that, when the old contract expired, there was no provision for arbitrators, and they sought to negotiate such a provision, but such negotiation effort was not accomplished.

■ A provision contained in Article XXIX of the 1978 agreement shows, unequivocally, that, when the parties intended for a provision of the contract to survive its termination, they said so. In that article, in relation to employees' health and insurance coverage, the parties agreed: "This paragraph shall survive the termination of the remainder of this Agreement and shall continue in effect until the purpose for which it was established is satisfied." Since the parties obviously knew what they were doing, if they intended for Article XXIII to survive, why didn't they say so? The court finds that they did not say so because that was not the intention. Instead, by clear implication, the court finds that the parties knew what they were doing when they drafted the arbitration provisions of the 1978 agreement and the provisions and negotiations discussed above clearly show to this court that they did not simply forget to provide whether the arbitration provisions would survive the termination of the contract, but clearly indicated that they did not intend for them to do so. Thus, the court finds, as *Nolde, supra,* requires, that the presumption favoring arbitrability is "negated expressly or by clear implication."

■ The court will enter judgment declaring that the plaintiff has no *contractual* duty to arbitrate those grievances arising and filed after the termination of the 1978 agreement on March 27, 1981, and will enjoin the UMWA from seeking to enforce the arbitration of these grievances as a matter of *contract*. Since there appears to be a serious question about whether this court has *in personam* jurisdiction of the other defendants, and since an injunction in respect to them would not appear to be necessary in view of the fact that the UMWA has, throughout this matter, clearly acted for them, the injunction will not be applicable to defendants other than the United Mine Workers of America. In addition, the court has expressly refrained from making any judgment in respect to the arbitrability of these grievances other than on a contractual basis and the holding

is limited in that respect. The court does not believe that it is permitted to rule in relation to the claim that the National Labor Relations Act, and the duties imposed by it, require arbitration of these grievances, and that a failure to do so is a "unilateral change" prohibited by 29 U.S.C. § 158(a)(5). There is presently a charge before the NLRB encompassing, among other things, this contention, and the court is convinced that Congress has provided that the NLRB is the proper forum, and the only proper forum, to resolve such disputes.

## GRIEVANCES ARISING BEFORE MARCH 27, 1981

The court recognizes that the reasoning set forth above would seem to automatically indicate that once the contract setting up the grievance procedure and the grievance board has expired, the duty to arbitrate also should expire. Logical as that may be, that does not seem to be what the cases hold. Even before *Nolde*, the United States Supreme Court, and other courts, did not seem to have any difficulty in holding that, when a dispute arose during the life of the contract but arbitration proceedings had not begun before termination, the expiration of the contract did not terminate the parties' contractual obligation to resolve the disputes by arbitration. *See John Wiley & Sons v. Livingston, supra; Steelworkers v. Enterprise Wheel & Car Corp.*, 363 U.S. 593, 80 S.Ct. 1358, 4 L.Ed.2d 1424 (1960); *Machine Workers v. Oxco Brush Div.*, 517 F.2d 239 (6th Cir. 1975); and *Procter & Gamble Ind. Union v. Procter & Gamble Mfg. Co.*, 312 F.2d 181 (2d Cir.1962).

In fact, the Court in *Nolde* seemed to indicate that that result was a foregone conclusion. In dealing with the employer's argument in that case that the termination of the collective bargaining agreement automatically extinguishes a party's duty to arbitrate grievances, the Court said:

Carried to its logical conclusion that argument would preclude the entry of a post-contract arbitration order even when the dispute arose during the life of the contract but arbitration proceedings had not begun before termination. The same would be true if arbitration processes began but were not completed, during the contract's term. Yet it could not seriously be contended in either instance that the expiration of the contract would terminate the parties' contractual obligation to resolve such a dispute in an arbitral, rather than a judicial forum. (citing the cases cited above.)

■ Thus, on whatever basis, the law appears to be well settled that disputes arising during the life of the contract, but for which arbitration proceedings had not begun or had not been completed by the time of termination of the agreement, continue to be arbitrable even after termination of the agreement. Thus, because of what it perceives to be the law in this respect, the court has no alternative but to find that the plaintiff's request for a declaratory judgment contained in Count II of its amended complaint shall not be granted.

The court recognizes that the grievances in respect to discharges at Rose Hill, Charleston and Bokoshe were not filed until May of 1982, long after the termination took place in March of 1981, and that it took under advisement plaintiff's motion for partial summary judgment raising a "laches" defense. It is clear from the evidence in this case that Garland took the position from a date soon after the termination of the contract until well past March of 1982 that it would not process grievances filed. Thus, it appears clear that it would have been futile for the grievances to have been earlier filed, and the court does not believe that the law requires prospective grievants to perform an act which would clearly be futile in order to preserve their claim. For this reason, the court hereby overrules the motion for partial summary judgment and, as indicated, declines to make any declaration, one way or the other, as to the arbitrability of these claims and, in fact, all of the grievances

which were intended to be encompassed by Count II of plaintiff's amended complaint.

## COUNTERCLAIM AND THIRD–PARTY COMPLAINT OF UMWA

As indicated, after the Union had raised the question of whether the plaintiff had sued all of the real parties in interest, and whether certain locals of the Union were necessary parties, plaintiff sought leave of the court to add these parties and to amend its complaint. Leave was granted by order dated December 15, 1983, after the court determined that the amendment would not substantially change the nature of the lawsuit and would not delay the trial of the case, then set for March 25, 1984. The amended complaint was filed on December 16, 1983, and, upon request of defendant UMWA, filed on December 28, 1983, the court, by order dated the same date, granted the defendants until January 10, 1984, to respond to the amended complaint. On that date, an answer was filed which was largely a general denial, although the pleading denied that the court had personal and subject matter jurisdiction in relation to some of the defendants.

In the intervening two months, although the Unions filed multiple pleadings in relation to discovery and a myriad of other issues, including a two-page motion and six-page brief seeking a continuance of the trial from the scheduled March 25, 1984, date, without even requesting leave of the court, they filed, on March 21, 1984, a document which they entitled "Supplemental Answer To The Amended Complaint For Declaratory Judgment and Third-Party Complaint." This document purported to bring into the lawsuit, without the consent of the court, two third-party defendants, Great Western Enterprises, Inc., and Toltec Coal Company. In addition, they purported, again without the consent of the court, to counterclaim against the plaintiff bringing into the lawsuit for the very first time, almost a year after the case was filed, and five days before the date that the case was then scheduled for trial, issues which totally changed the nature of the lawsuit. Up

to this point, it had been a relatively simple (although the file would not bear this out) declaratory judgment action involving the arbitrability of grievances. The new pleading filed by the Unions claimed that Garland, Great Western and Toltec constitute "alter egos with each other, as that term is understood under the federal labor laws," and sought to have the court determine the Unions' right "(a) as a contractual obligation, (b) as a statutory obligation under 29 U.S.C. § 158(a)(5), (c) as a constitutional obligation under Article 9, section 42 of the Oklahoma Constitution, and/or (d) as an obligation under a settlement agreement between the Employer and the National Labor Relations Board executed in NLRB Case No. 16–CA–9839."

Thus, it is obvious from a mere reading of this pleading that not only was it filed without consent of the court or, in fact, even any notice that it was to be filed, more importantly, it drastically and completely changed the nature of the lawsuit and the parties to it. At the time that this pleading was filed, the court, in a telephone conversation, advised the attorneys for the parties that the filing would not be permitted, but, unfortunately, an order was not entered at that time, a fact that was not discovered in all the morass of "papers" generated in this file until the matter was being prepared for trial. In any event, the attorneys for the parties were aware that those issues could not be tried, because of the stay order in the bankruptcy proceeding, even if the counterclaim and third-party complaint had been permitted, so no prejudice resulted from the failure to enter a formal order at the time of the court's ruling.

█ In short, there appears to be little question but that the court was correct at the time in ruling that the pleading would not be permitted, and the court now finds that a formal order should be entered dismissing the counterclaim and third-party complaint.

## CONCLUSION

In short, as the court indicated, it is doubtful that all of this has accomplished

very much. The court specifically finds that there was a controversy for which this court has jurisdiction in respect to the grievances which arose after March 27, 1981, because the Union did, in the past, through word and deed, indicate that it contended that the employer had a contractual duty to arbitrate the grievances. The court has simply ruled that no such contractual duty exists in relation to these grievances. Since the Union now appears to argue that it has never contended that such a contractual obligation exists, but, instead, believes that a duty is imposed by the provisions of the National Labor Relations Act, the parties seem to be very nearly in the same position as they were prior to the court ruling.

In respect to the other grievances, the court simply rules that the request for a declaratory judgment in relation to them will not be granted. Thus, in short, the Union is only precluded from contending that the employer has a contractual obligation to arbitrate the grievances which arose after March 27, 1981. This should not effect the matters pending before the National Labor Relations Board except to the extent that the Union will not be permitted in that forum or any other forum to contend that the obligation to arbitrate is a contractual one. The court urges the parties to discontinue the obviously expensive "piecemeal litigation" of the controversies between them and to either settle their differences by negotiation or by placing "the whole ball of wax" before some body which has the authority and jurisdiction to settle the entire matter.