Joan ARIF; Ahmed Arif; John C. Becker; Francis Bell; Lloyd Bright; Charles E. Brooks; Ninfa Cisneroz; Diana K. Clark; Thomas J. Crokin; Janice M. Dietsche; William Domzalski; Abel D. Enriquez; Mark Flowers; Chester H. Gniadek; Jose L. Gomez; Ana M. Gonzalez; Sandra S. Hawthorne; Arnice Hayes; Shirley M. Herbert; Antonio Herrera, Richard L. Hopkins; Thomas Kickler; Chung S. Kim; Cecelia J. Leathers; Ikie A. Ledbetter; Charles R. Lusk; Ellen K. Meurlott; Donald T. Meurlott; Jane J. Migut; Irene Newsome; Rayburn Page; Torrance B. Paydon; James F. Planek; Roscoe Porep; Judith L. Reed; Carol J. Rigler; Henry W. Rigler; Emma Sampson; Geneva Scruggs; Patricia A. Serrato; Lee L. Sizemore; Charles Southall; Annie Stewart; Ronald D. Stucker; Thelma D. Triplett; Salvador Venecia; Peter J. Viernes; and Mattie Gillespie, Plaintiffs,

v.

AT&T CORPORATION, Defendant.

No. LR–C–95–328.

United States District Court,
E.D. Arkansas,
Western Division.

Feb. 11, 1997.

William P. Doughtery, Hoover, Doughtery & Kooistra, Little Rock, for Plaintiffs.

N.M. Norton, Jr., Wright, Lindsey & Jennings, Little Rock, James D. Cutlip, Morristown, NJ, for Defendant.

## ORDER

STEPHEN M. REASONER, Chief Judge.

Pending before the Court is the Motion for Summary Judgment filed on behalf of the

defendant, AT&T Corporation. For the reasons stated herein, the Motion is granted.[1]

## I. FACTUAL BACKGROUND

On October 19, 1993, AT&T announced that it was relocating all of its repair, returns and refurbishing work from its West Chicago facility to its facility in Little Rock, Arkansas. All plaintiffs in this action are employees who, at the time of their transfer, were employed by AT&T in its West Chicago plant and were covered by a Collective Bargaining Agreement [hereinafter "CBA"] between their union, the Communications Workers of America, and AT&T.[2]

Shortly after AT&T announced the transfer to Little Rock, each plaintiff was provided a Preference Survey which stated that if they wished to be considered for a job in Little Rock, they were to indicate their preference regarding future employment with AT&T. All plaintiffs returned Preference Surveys which stated that each desired that their transfer be based on Article 19 of the CBA.[3] Article 19 of the CBA is entitled "Facility Closing Program." Under the provisions of Article 19, reference is made to the AT&T Transfer System [hereinafter "Transfer System"], which is the article of the CBA that provides for transferring an employee from one location to another, including the transfer to another bargaining unit.

Under the Transfer System, if a transferring employee suffers a reduction in wage rate, the employee is entitled to a total of 60 weeks wage protection, also referred to as "cushioning", based on years of service. Defendant concedes that each plaintiff in the present action had sufficient service to qualify for the maximum wage protection period of 60 weeks under the Transfer System. Each plaintiff was, in fact, paid a lump sum for 60 weeks cushioning upon their transfer to Little Rock. Defendant argues that at no time since the transfer was first announced did anyone with AT&T management ever tell any plaintiff that they were transferred to little Rock other than under the provisions of Article 19 and the Transfer System.

On January 4, 1994, the CWA in West Chicago filed a grievance on behalf of plaintiffs claiming that plaintiffs were entitled to 160 weeks of wage protection under Article 17 of the CBA.[4] AT&T denied the CWA's grievance on March 10, 1994. Although the record is not clear on this point, it appears that the CWA then proceeded to take the claim to Master Bargaining on March 18, 1994. At some time after this, the grievance was again denied by AT&T. On May 10, 1994, the CWA President indicated by letter to AT&T's Executive Vice President that no further action would be taken by the union.

Plaintiffs were actually transferred to Little Rock in the period from June to August of 1994. On May 31, 1995, plaintiffs instituted the present suit under Section 301 of the Labor Management Relations Act [hereinafter "LRMA"], seeking a declaratory judgment that each plaintiff is entitled to a wage protection payment in accordance with Article 17, Sections 1.2 and 1.3 of the CBA, and alleging that each plaintiff is entitled to damages equal to 100 weeks of Wage Protection Allowance for AT&T's alleged breach of the Collective Bargaining Agreement.

## II. ARGUMENTS

Defendant has moved for summary judgment based on four separate grounds. First,

1. Because of the Court's disposition of this case, the pending Motion in Limine (Doc. Num.58) and Motion for Reconsideration (Doc. Num.63) are deemed moot.

2. Plaintiffs are presently employed by AT&T in Little Rock and are covered by a CBA with the International Brotherhood of Electrical Workers.

3. In the Preference Survey, plaintiffs were given the choice of: (1) being transferred under Article 19; (2) taking special leave under the AT&T Special Leave Program; or (3) being terminated and paid pursuant to the closing schedule contained in Article 18.

4. This Article provides that when an employee with fifteen (15) or more years of employment is downgraded or transferred due to technological change, or when an employee with twenty (20) or more years of employment is downgraded or transferred due to either the contracting out of work to another company or the movement of a job to another AT&T location, those employees shall be paid wage protection in accordance with certain schedules contained in the CBA. The Court assumes, for purposes of discussion, that this would entitle each of the plaintiffs to 160 weeks of wage protection.

AT&T argues that plaintiffs do not have standing as individuals to maintain the present action because this suit involves a claim for which only their union may seek redress. Second, AT&T states that the plaintiffs' lawsuit is untimely because it was not commenced within the six-month statute of limitations provided in Section 10(b) of the Labor Management Relations Act. Third, defendant contends that in order for plaintiffs to state a cause of action under Section 301 of the LMRA, they must plead and prove that the CWA breached its duty of fair representation, which they have not done. Finally, defendant argues that the plaintiffs have not set forth a cause of action as to their claim that AT&T violated the CBA because each plaintiff knew he or she was being transferred under the provisions of Article 19 and each plaintiff accepted the transfer according to the terms contained in Article 19. The Court will address each of these arguments in the order presented.

## A. Standing

AT&T argues that summary judgment is proper because plaintiffs do not have standing as individuals to maintain the present action. Defendant contends that the right to cushioning that plaintiffs are seeking to assert is not the type of right which gives rise to individual standing under Section 301 of the LRMA. Rather, according to AT&T, this suit involves a claim for which only plaintiffs' union may seek redress, as it is a claim that runs to a right possessed by the statutory collective bargaining representative.

Section 301 of the LMRA provides that "[s]uits for violation of contracts *between an employer and a labor organization representing employees* ... may be brought in any district court of the United States having jurisdiction of the parties...." 29 U.S.C. § 185(a)(emphasis added). However, the United States Supreme Court has recognized that Section 301 grants union members, individually, the opportunity to vindicate rights that are "uniquely personal." *Smith v. Evening News Assoc.*, 371 U.S. 195, 200, 83 S.Ct. 267, 270, 9 L.Ed.2d 246 (1962). Further, in *Hines v. Anchor Motor Freight, Inc.*, 424 U.S. 554, 562, 96 S.Ct. 1048, 1055, 47 L.Ed.2d 231 (1976), the Court discussed the strong federal policy favoring judicial enforcement of collective bargaining agreements by noting:

> Section 301 of the Labor Management Relations Act ... reflects the interest of Congress in promoting 'a higher degree of responsibility upon the parties to such agreements....' S.Rep. No. 105, 80th Cong., 1st Sess., 17 (1947). The strong policy favoring judicial enforcement of collective-bargaining contracts was sufficiently powerful to sustain the jurisdiction of the district courts over enforcement suits even though the conduct involved was arguably or would amount to an unfair labor practice within the jurisdiction of the National Labor Relations Board. *Smith v. Evening News Assn.*, 371 U.S. 195, 83 S.Ct. 267, 9 L.Ed.2d 246 (1962); *Atkinson v. Sinclair Rfg. Co.*, 370 U.S. 238, 82 S.Ct. 1318, 8 L.Ed.2d 462 (1962); *Teamsters v. Lucas Flour Co.*, 369 U.S. 95, 82 S.Ct. 571, 7 L.Ed.2d 593 (1962); *Charles Dowd Box Co. v. Courtney*, 368 U.S. 502, 82 S.Ct. 519, 7 L.Ed.2d 483 (1962). Section 301 contemplates suits by and against individual employees as well as between unions and employers; and *contrary to earlier indications § 301 suits encompass those seeking to vindicate 'uniquely personal rights of employees such as wages, hours, overtime pay, and wrongful discharge. Smith v. Evening News Assn., supra,* at 198–200 [83 S.Ct. at 269–70]. Petitioners' present suit against the employer was for wrongful discharge and is the kind of case Congress provided for in § 301.

*Hines,* 424 U.S at 561–62, 96 S.Ct. at 1055 (emphasis added).

One of the most recurring criticisms of the *Smith v. Evening News* case is that the Supreme Court did not attempt to define what constituted a "uniquely personal" right. As Justice Black noted in his dissent, "the Court studiously refrain[ed] from saying when, for what kinds of breach, or under what circumstances an individual employee can bring a Section 301 action and when he must step aside for the union to prosecute his claim." 371 U.S. at 204, 83 S.Ct. at 272 (Black, J., dissenting). Plaintiffs readily concede that individual standing to maintain a

Section 301 suit is the exception, rather than the rule.

The only light shed on the "uniquely personal" issue by the *Smith* court was by way of a (presumably non-exclusive) laundry list of uniquely personal rights. Among those rights giving rise to individual standing were wages, hours, overtime pay and wrongful discharge. *Id.* at 198–200, 83 S.Ct. at 269–70. *See also, Hines,* 424 U.S. at 562, 96 S.Ct. at 1055. To aid in the analysis, lower courts have concluded that the issue of whether a plaintiff is seeking to vindicate "uniquely personal" rights is typically resolved by resorting to the specific section of the CBA at issue. *Schultz v. Owens–Illinois, Inc.,* 560 F.2d 849, 853 (7th Cir.1977), *cert. denied,* 434 U.S. 1011, 98 S.Ct. 723, 54 L.Ed.2d 754 (1978). *See also, Woody v. Sterling Aluminum Prod., Inc.,* 244 F.Supp. 84, 90 (E.D.Mo. 1965), *aff'd,* 365 F.2d 448 (8th Cir.1966), *cert. denied,* 386 U.S. 957, 87 S.Ct. 1026, 18 L.Ed.2d 105 (1967), *reh'g denied,* 386 U.S. 1027, 87 S.Ct. 1371, 18 L.Ed.2d 471 (1967).

In the instant case, plaintiffs argue that they should have been transferred pursuant to Article 17 of their CBA with AT&T.[5] Article 17 provides:

1. Reduction in Rate Due to Lack of Work, Subcontracting, Work Transfer or Technological Change

1.1 When an employee would suffer an immediate reduction in STANDARD RATE, as applicable, because of downgrading, or reclassification or other formal transfer made due to lack of work or directly and immediately due to either the contracting out of work to another company or the movement of a job to another AT&T location, the employee shall be paid a Wage Protection Allowance (WPA) starting with the effective date of such transfer or downgrading and then reduced gradually. Except as provided in Paragraph 2.3 the allowance shall be paid in accordance with the following schedule: . . . .

1.2 An employee with fifteen (15) or more years of TERM OF EMPLOYMENT who is so downgraded or transferred due to technological change or an employee with twenty (20) or more years of TERM OF EMPLOYMENT who is so downgraded or transferred directly and immediately due to either the contracting out of work to another company or the movement of a job to another AT&T location, shall be paid a Wage Protection Allowance (WPA) as determined in Paragraph 1.3 starting with the date of such downgrade or transfer and then reduced gradually. Such an employee will be paid the allowance in accordance with the following schedule in lieu of the schedule shown in Paragraph 1.1 above: . . . .

1.3 Except as provided in Paragraph 1.4, the amount of WPA shall be calculated as follows:

(a) If the employee's STANDARD RATE (plus any existing WPA) is at or above the MAXIMUM RATE of the Occupational Job Classification from which demoted or reclassified, the allowance shall be the difference between the STANDARD RATE (plus any existing WPA) of the Occupational Job Classification from which demoted or reclassified and the MAXIMUM RATE of the new Occupational Job Classification.

(b) If the employee's STANDARD RATE (plus any existing WPA) is below the MAXIMUM RATE of the Occupational Job Classification from which demoted or reclassified, the allowance shall be the difference between the employee's STANDARD RATE (plus any existing WPA) on the job from which demoted or reclassified and the STANDARD RATE based on the Progression Step to which assigned on the lower level Occupational Job Classification. However, such allowance will be reduced by the amount of any Progression Increases the employee subsequently receives in the lower level Occupational Job Classification.

---

**5.** Plaintiffs argue that application of Article 19's "Facility Closing" provisions was not warranted in the present case because the West Chicago facility was never closed by AT&T.

The Court notes initially that the terms of Article 17 are mandatory in nature, subject to the schedules therein contained. Second, it would appear that a factual situation which would be unique and personal to a particular employee establishes the necessary and sufficient circumstances for WPA entitlement. For example, in order to receive a Wage Protection Allowance under Article 17, Paragraph 1.2, a given employee must have at least fifteen to twenty years of employment with AT&T. Additionally, the employee must be downgraded or transferred due to: (1) technological change; or (2) either the contracting out of work to another company or the movement of a job to another AT&T location. If those circumstances are all present, an employee is entitled to cushioning as set forth in Paragraph 1.3.

The Eighth Circuit has addressed the issue of an individual's standing to maintain an action under Section 301. *Brown v. Sterling Aluminum Products Corp.*, 365 F.2d 651 (8th Cir.1966), *cert. denied*, 386 U.S. 957, 87 S.Ct. 1023, 18 L.Ed.2d 105, *reh'g denied*, 386 U.S. 1027, 87 S.Ct. 1370, 18 L.Ed.2d 471 (1967). In *Brown*, the court noted:

> Under certain restricted circumstances the law clearly allows the individual members of the union to bring an action under § 301 to enforce their individual rights [citations omitted]. These cases allow the individual enforcement of rights secured under a collective bargaining agreement after certain prerequisites have been met, such as seeking use of established grievance machinery and affording the union a chance to act on their behalf
>
> We believe, however, that for an individual to bring an action under § 301 he must be seeking to enforce a right that is personal to him and vested in him at the time of the suit. *Humphrey v. Moore*, 375 U.S. 335, 84 S.Ct. 363, 11 L.Ed.2d 370 (1964). Therefore, individual suits to compel arbitration of individual grievances are permissible as are individual suits to enforce an arbitration award in which the individual has a personal interest. *Smith v. Evening News Association*, *supra*. However, whenever the right sought to be enforced is not uniquely personal to the individual but is a right possessed by the bargaining

unit as a whole, only the Union as the sole representative of that unit would normally have the standing to enforce the right. Thus the individual would have no standing to compel discussion of broad collective bargaining principles such as the re-negotiation of a new contract or the relocation of a plant, even if such discussion were required by the existing collective bargaining agreement.

*Id.* at 656–67. Thus, in *Brown*, the court held that plaintiffs' union was the exclusive representative and only the union could seek to bargain with the company regarding the company's decision to relocate its business. Defendant relies almost entirely on *Brown* in support of its argument that plaintiffs lack standing in the present case. The Court finds that *Brown* and other authority cited by AT&T are distinguishable from the facts of the case at bar.

In *Brown*, the plaintiffs filed suit seeking to compel the discussion of broad collective bargaining principles, i.e., the relocation of the company plant and the renegotiation of a collective bargaining agreement between the employer and the union. Clearly, the two rights plaintiffs were seeking to enforce in *Brown* were not uniquely personal to the individuals, but "[were] ... right[s] possessed by the bargaining unit as a whole...." *Brown*, 365 F.2d at 657. Thus, only the union, as the sole representative of a particular unit, would normally have standing to enforce these rights.

■ Defendant argues that *Brown* is dispositive of the issue at hand because it clearly states that individual plaintiffs may not sue their employer when their complaint relates to the relocation of a plant. Plaintiffs, however, are not attempting to compel a negotiation with the employer regarding the relocation. Rather, they are attempting to enforce rights to which they are each allegedly entitled pursuant to their union's CBA with AT&T. That these alleged rights might be triggered by the relocation of the plant in Chicago does not affect the Court's conclusion that the right to cushioning is a "uniquely personal" right of each employee.

Also distinguishable is *Gutierrez v. United Foods*, 11 F.3d 556 (5th Cir.1994), *cert. denied*, 511 U.S. 1142, 114 S.Ct. 2164, 128 L.Ed.2d 887 (1994). In that case, the Fifth Circuit held that only the union may seek to enforce a "successors and assigns" clause when the company sold part of its business. Again, at issue in *Gutierrez* was a right that affected the bargaining unit as a whole. In *Gutierrez*, the individual plaintiffs brought suit against their employer alleging that, by failing to require a purchaser of the company to assume the collective bargaining agreement, the employer had breached the successors and assigns clause. As the *Gutierrez* court noted, the "line between personal and collective rights is not entirely pellucid." *Id.* at 560. However, the Court then went on to conclude that the *Gutierrez* facts did not present a marginal situation with regards to the "uniquely personal right" issue. *See also, Hill v. Ralphs Grocery Co.*, 896 F.Supp. 1492 (C.D.Cal.1995)(holding that individual plaintiffs could not maintain action where they alleged that employer breached CBA by permanently discontinuing its central baking operations, shutting down bakery facility and terminating plaintiffs' employment before expiration of CBA's three-year term, and by allegedly transferring bargaining unit work to an alter ego or successor company because these asserted rights were collective and ran to all employees in equal measure).

Plaintiffs claim in. the instant case is certainly not of the sort addressed by *Gutierrez*, as it does not run to all employees in equal measure, nor does it affect the bargaining unit as a whole. Rather, the Court finds that the rights plaintiffs are seeking to enforce are "uniquely personal." *See also, Diaz v. Schwerman Trucking Co.*, 709 F.2d 1371 (11th Cir.1983)(per curiam)(holding that employees could sue to recover the back pay to which they were entitled under a collective bargaining agreement); *Lucas v. Bechtel Corp.*, 633 F.2d 757, 759–60 (9th Cir.1980)(holding that plaintiffs had standing to maintain action against employer for wages claimed under allegedly breached CBA, as the asserted right was not a right reserved to the union such as picketing, renegotiating a contract or protesting a plant relocation); *Schultz v. Owens–Illinois, Inc., supra* (holding that individual plaintiffs had standing to maintain suit for breach of apprenticeship training provision of CBA); *Lerwill v. Inflight Motion Pictures, Inc.*, 582 F.2d 507, 511 (9th Cir.1978)(holding that two employees had standing to sue to recover overtime pay as provided under a collective bargaining agreement). Thus, the Court concludes that plaintiffs have individual standing to prosecute this lawsuit.

### B. Statute of Limitations

■ Defendant next argues that plaintiffs' lawsuit is barred because it was not instituted within the six-month statute of limitations period provided in Section 10(b) of the LRMA. On its face, Section 10(b) is only applicable to complaints for unfair labor practices which are filed by the National Labor Relations Board.[6] Section 301 (under which plaintiffs have filed the present lawsuit), however, does not set forth a specific statute of limitations. Usually, when federal statutes are silent on limitations periods, the courts should borrow a statute of limitations from state law. *See, e.g., Int'l Union, United Auto. Workers of America v. Hoosier Cardinal Corp.*, 383 U.S. 696, 703–04, 86 S.Ct. 1107, 1111–13, 16 L.Ed.2d 192 (1966). An exception to the "borrowing rule", however, exists when "analogous state statutes of limitations ... frustrate or significantly interfere

---

**6.** Specifically, Section 10(b) provides:

Whenever it is charged that any person has engaged in or is engaging in any such unfair labor practice, the Board, or any agent or agency designated by the Board for such purposes, shall have power to issue and cause to be served upon such person a complaint stating the charges in that respect, and containing a notice of hearing before the Board or a member thereof, or before a designated agent or agency, at a place therein fixed, not less than five days after the serving of said complaint: *Provided, That no complaint shall issue based upon any unfair labor practice occurring more than six months prior to the filing of the charge with the Board and the service of a copy thereof upon the person against whom such charge is made,* unless the person aggrieved thereby was prevented from filing such charge by reason of service in the armed forces, in which event the six-month period shall be computed from the day of his discharge. ·

29 U.S.C. § 160(b)(emphasis added).

with federal policies." *Reed v. United Transp. Union,* 488 U.S. 319, 109 S.Ct. 621, 102 L.Ed.2d 665 (1989). In such cases, a federal statute of limitations may be the more appropriate choice.

In *DelCostello v. Int'l Brotherhood of Teamsters,* 462 U.S. 151, 103 S.Ct. 2281, 76 L.Ed.2d 476 (1983), the United States Supreme Court determined that Section 301 claims were the type of situation in which a state statute of limitations should not be borrowed. Rather, in that case, the Court held that the six-month limitations period provided in Section 10(b) of the LRMA applies to Section 301 claims brought against an employer.

 What plaintiffs have pled in the instant case is known in labor law parlance as a "hybrid action" under Section 301. A hybrid case is one in which the employee has a cause of action against both the employer and the union. The claim against the employer is that it violated the collective bargaining agreement. The claim against the union is that the union did not properly represent the employee in pressing his grievance against the employer. *See Vaca v. Sipes,* 386 U.S. 171, 185–86, 87 S.Ct. 903, 914–15, 17 L.Ed.2d 842 (1967). A hybrid case can present itself even though the union has not been sued. *McKee v. Transco Prod., Inc.,* 874 F.2d 83 (2d Cir.1989). In fact, the law is clear that regardless of who is named as a defendant, a hybrid claim is presented if an employee has a cause of action against both the employer and the union, the two claims are inextricably linked, and the case to be proved is the same against both. *DelCostello,* 462 U.S. at 164–65, 103 S.Ct. at 2290–91.

Plaintiffs have concededly brought the present lawsuit under Section 301 of the LRMA. *See* Third Amended Complaint, ¶ 3. Their Complaint alleges that defendant breached the terms of the Collective Bargaining Agreement in effect between CWA and AT&T. Additionally, plaintiffs allege that the CWA, as their union:

> ... owed a duty of fair representation to these Plaintiffs including the filing and processing of their grievances arising out of the facts alleged in this lawsuit. The

Union breached its duty by, among other things, failing to file and process the Plaintiffs' grievances; failing to properly represent these Plaintiffs in the grievance procedure set forth in the Collective Bargaining Agreement; failing to properly notify and advise these Plaintiffs of the action which it was taking; failing to fully investigate the facts and circumstances surrounding the matters complained of herein; and failing and refusing to make a full, complete, timely, and material disclosure of all circumstances surrounding the Plaintiffs' rights under the Collective Bargaining Agreement and the action which it, the Union, was taking in regard thereto. Nevertheless, any further effort by these Plaintiffs to resolve the dispute with the Defendant AT&T would have been futile, useless and of no effect.

However, unknown to these Plaintiffs at the time, AT&T apparently contacted, bargained with, and had, in fact, entered into an agreement in June 1993 with the International Brotherhood of Electrical Workers ("IBEW") over the jobs at issue in this lawsuit. The IBEW was the exclusive bargaining agent at the AT&T facility in Little Rock. AT&T was under a duty to disclose this information to the Union and the Plaintiffs during their August 1993 concessionary bargaining session over terms of their Collective Bargaining Agreement. But, upon belief, no such disclosure was made, and the failure by AT&T to do so meant that it did not engage in good faith bargaining. Under these circumstances, the Union either breached its duty as more fully pleaded above or AT&T's action repudiated the Collective Bargaining Agreement provisions which established Union as the exclusive bargaining agent—thereby relieving Union of any duty in this matter, a fact unknown to these Plaintiffs and a fact they could not have known in attempting to protect their rights herein. AT&T is estopped from arguing otherwise.

Third Amended Complaint, ¶ 8. Based on these allegations, the present lawsuit is properly characterized as a hybrid action.

The grievance which CWA asserted on behalf of the plaintiffs was first filed in Janu-

ary 1994. This grievance was denied by AT&T on March 10, 1994. *See* Exhibit "B" of Defendant's Brief in Support of Motion for Summary Judgment. Exhibit "B" contains excerpts of the deposition testimony of Donald Forester, District Manager of Labor Relations for AT&T. During' his deposition Mr. Forester produced a letter dated March 10, 1994, which he wrote to Ralph Maly, Jr., Staff Representative for the CWA. That letter unambiguously advises Mr. Maly that AT&T had denied the grievance. *Id.* ("This letter serves as a response to your January 4, 1994 grievance concerning the pay reduction schedule for employees transferred from West Chicago Repair Center to the Little Rock Repair and Distribution Center.... Therefore, the 160 weeks wage protection does not apply, and this grievance is de-' nied.").

Each plaintiff was transferred to Little Rock in the period from June to August of 1994 and received a lump sum buyout for 60 weeks of wage protection upon their arrival in Little Rock. Defendant argues that, at the very latest, it was in August of 1994 that plaintiffs, as a group, knew they would have to institute a lawsuit in order to preserve their claim for additional cushioning. Thus, defendant asserts that since this lawsuit was not filed until May 31, 1995, it is untimely.[7] According to the defendant, the very latest plaintiffs would have been able to institute

their lawsuit would have been in February 1995, six months after August 1994.

■ Even though the plaintiffs have elected to sue only their employer, the six-month statute of limitations contained in Section 10(b) applies. This is because the separate causes of action against the employer and the union accrue simultaneously. As the Eighth Circuit noted in *Livingstone v. Schnuck Market*, 950 F.2d 579, 581 (8th Cir.1991), plaintiffs may not circumvent the six-month statute of limitations by choosing to sue only their employer.

In support of their contention that their lawsuit is not barred, plaintiffs argue that a Section 301 cause of action does not begin to accrue until the grievance is finally rejected and other contractual remedies are rejected by the union. Additionally, they contend that there is no evidence before this Court regarding either when the CWA decided not to arbitrate plaintiffs' grievance or when the plaintiffs first knew of this fact. They contend, therefore, that a genuine issue of material fact exists in this regard.

■ The employees point to the deposition testimony of several individual plaintiffs to establish that there was a general lack of knowledge on the part of plaintiffs regarding the status of the grievance.[8] As the Eighth

---

7. Defendant also contends that this action is untimely because leave to amend the Complaint to include an essential allegation that the union had violated its duty of fair representation was not granted until November 1995. However, the Court agrees with the plaintiffs that this fact is irrelevant for limitations purposes because any amendment of the Complaint would relate back to the original date of filing under Federal Rule of Civil Procedure 15(c)(2).

8. Specifically, plaintiff Diana Clark testified in her deposition that she did not find out that the grievance process was completed until right before she went to talk to her lawyer, which was sometime after her actual transfer to Little Rock. Deposition of Diana Clark, pp. 12–15.

Plaintiff Jose Gomez testified that he was under the impression that the 60 weeks cushioning he received was simply money for coming to Little Rock and that it had nothing to do with the 160 weeks of cushioning that he understood he was supposed to get. Further, he did not know that by cashing the check for 60 weeks that he

was giving up his right to 160 weeks of cushioning. Deposition of Jose Gomez, pp. 13–14.

Plaintiff Abel Enriquez testified that he became aware of the CWA grievance through shoptalk after he was already in Little Rock. Deposition of Abel Enriquez, pp. 6–12.

Plaintiff Charles Southall testified that his understanding was that he was entitled to 160 weeks of pay and that his check for $14,080 was only a portion of that amount. Deposition of Charles Southall, pp. 19–25.

Plaintiff Rayburn Page testified that he received a check upon his transfer but that he thought it was only a partial payment on the 160 weeks of cushioning under Article 17. Further, he took no action on the matter because he knew that the CWA had filed a grievance. It was not until after the institution of this lawsuit that he discussed the matter with Mr. Sierra, a CWA representative. Deposition of Rayburn Page, pp. 16–19.

Plaintiffs argue that Mr. Page was not asked about the status of the arbitration or what he knew about it or when he had ever known that the CWA refused to process his grievance

Circuit has repeatedly held, however, the union is not required to give the employees unequivocal notice before the employees' cause of action begins to accrue. Thus, the fact that the individual plaintiffs may not have been aware that the union had ceased its efforts on their behalf would not stop the limitations clock from ticking. *Livingstone v. Schnuck Market, Inc.*, 950 F.2d 579 (8th Cir.1991). *See also, Cook v. Columbian Chemicals Co., infra.*

Plaintiffs are correct that the record does not reveal the exact date that the Master Bargaining (which commenced on March 18, 1994) broke down between labor and management regarding the subject claim. However, plaintiffs have submitted the very evidence they allege is lacking regarding the date the CWA abandoned its arbitration efforts. Specifically, plaintiffs' Exhibit Number 7 to their Response to the Motion for Summary Judgment disposes of this argument. Exhibit Number 7 contains two letters, both from Mr. Morton Bahr, President of the Communication Workers of America. Only the first letter is relevant to the statute of limitations issue.

■ The first letter is dated May 10, 1994 [9] and is addressed to Mr. Robert Kavner, the Executive Vice President and CEO Multimedia Products and Services Group for AT&T. In that letter, Mr. Bahr states, in part: "The company's conduct in West Chicago was dishonest and left a stench in the nostrils of all who participated. While nothing can be done at this time, I do want you to know what really happened." This letter made clear to AT&T that the CWA would not press its grievance any further. Thus, it was on this date that the CWA rejected further contractual remedies, i.e., arbitration, and plaintiffs' cause of action accrued. Six months from the date of this letter would have been November 10, 1994. Additionally, the Court notes that even if the contents of the letter itself did not establish the date that

the CWA decided not to proceed with further arbitration, the plaintiffs' action is nevertheless barred based upon the application of constructive notice principles.

■ The Eighth Circuit has held that the employee's cause of action accrues under Section 10(b) when the Union decides not to pursue the grievance and this Circuit "... has never required that the union give the employee unequivocal notice before the employee's cause of action begins to accrue." *Cook v. Columbian Chemicals Co.*, 997 F.2d 1239, 1241 (8th Cir.1993)(*citing Livingstone v. Schnuck Market, Inc.*, 950 F.2d 579, 581 (8th Cir.1991)); *Gustafson v. Cornelius Co.*, 724 F.2d 75, 79 (8th Cir.1983). Thus, even if plaintiffs did not have actual notice that the CWA had elected not to proceed with the grievance procedure, they were put on constructive notice that the Union had elected not to proceed to arbitration by operation of the Collective Bargaining Agreement. *Cook, supra* (stating that "... notwithstanding the lack of an actual notice requirement, constructive notice of the existence of [plaintiffs'] cause of action could be imputed to [them] by operation of the collective bargaining agreement under which [they] worked."). Similarly, the plaintiffs in the instant case are charged with constructive knowledge of their cause of action against AT&T pursuant to Article 7 of the CBA.

Under Article 7, the CWA had 60 days after AT&T denied the grievance to institute arbitration proceedings. Under the principles announced in *Cook*, plaintiffs' cause of action therefore, accrued, at the latest, sixty days after the claim was denied during Master Bargaining. While the Court has already noted that this date is not revealed in the record, it is apparent that it was sometime before the May 10, 1994 letter. For purposes of discussion, the Court will assume that Master Bargaining broke down on May 10, 1994.

through arbitration. Further, Mr. Page simply testified that he knew he might have to sue AT&T and begin soliciting others, but he was not asked about when he intended to do that, whether he was waiting on the outcome of his arbitration demand, or even if he understood how the lawsuit and arbitration impacted each other.

9. Apparently, this letter was written exactly 60 days after AT&T initially denied the grievance filed by the CWA.

Pursuant to Article 7, the CWA had sixty days from that date to institute arbitration proceedings, which would have been July 9, 1994. The six-month statute of limitations period, then, would have expired on January 9, 1995. Plaintiffs' lawsuit, however, was not instituted until May 31, 1995. The fact that plaintiffs may not have been aware of when the CWA decided not to arbitrate is irrelevant to the statute of limitations issue. Again, this is because the Eighth Circuit has never held that the union give the employee unequivocal notice before the employee's cause of action begins to accrue. *Livingstone*, 950 F.2d at 583.

In *Cook*, the plaintiff's union filed a grievance on his behalf with his employer on August 28, 1991. The employer denied the grievance on September 12, 1991. Under the terms of the applicable collective bargaining agreement, arbitration was available to resolve disputes over discharge; however, the union was required to request such arbitration, if at all, within 60 days after the grievance was filed. The sixty-day period lapsed without any action by the union. Thus, the time to seek arbitration expired on October 27, 1991. On February 1, 1992, the plaintiff received a copy of a letter from his employer to his union indicating that, although the time for arbitration had passed, the employer was willing to discuss the matter further.

The plaintiff in *Cook* filed his lawsuit on June 29, 1992 and argued that the limitations period began to run on February 1, 1992, the date he received a copy of the letter advising him that the union had not taken action within the sixty-day period. The Eighth Circuit rejected this argument and held that the statute of limitations began to run on October 27, 1991, the last day the union could

have sought arbitration. Thus, the statute of limitations expired on April 27, 1992, and plaintiff's lawsuit was barred. The Court finds that the result must be the same in the instant case.[10] Under the relevant Eighth Circuit authority, it is not required that plaintiffs be made aware of when the CWA decided not to pursue their grievance to arbitration.

### 1. Equitable Tolling

Plaintiffs alternatively argue that the doctrine of equitable tolling salvages this lawsuit because AT&T "lied" to the plaintiffs in its October 1993 announcement to its employees concerning the status of bargaining with the International Brotherhood of Electrical Workers in Little Rock. Apparently, plaintiffs argue that because AT&T failed to disclose to the West Chicago CWA bargaining team the fact that it was bargaining with the Little Rock IBEW during the "critical concessionary bargaining discussions" in August 1993, equitable tolling applies. Plaintiffs argue that had they known the true status of the "illegal"[11] bargaining and contract with the IBEW, the interests of these plaintiffs could have been protected at that time in early 1993 by filing a charge with the National Labor Relations Board, a grievance, or even a lawsuit against AT&T. They allege that they were prevented from doing so because AT&T kept its "illegal" contract with the IBEW a secret. Plaintiffs' contend that it was not until formal discovery was conducted in this lawsuit that they were made aware of AT&T's actions with the IBEW.

In *Wainscot v. Int'l Bhd. of Teamsters*, 830 F.Supp. 519 (W.D.Mo.1993), the court held that the Section 10(b) statute of limitations may be tolled when a defendant has made

---

**10.** Even giving the plaintiffs the benefit of all possible doubt, the Court notes that the absolute latest their cause of action could have accrued would have been in August 1994 when they were all transferred to Little Rock and had all received checks representing only sixty weeks of cushioning. Six months from that date would have been sometime in February 1995, which would have still rendered the instant lawsuit untimely.

**11.** Plaintiffs characterize the IBEW negotiations and contract as illegal because under the Labor Management Relations Act, the "contract-bar" rule prohibits transfer of the exclusive recogni-

tion of one bargaining agent to someone else. Under the contract-bar rule, a collective bargaining agreement protects an existing bargaining relationship from challenge for the contract term. The rule also bars employers from repudiating the contract or withdrawing recognition of a union for the contract term (in the case here, the CWA contract term was for three years commencing May 31, 1992). Plaintiffs argue, therefore, that AT&T's contract with the IBEW in June 1993 violated the contract-bar rule and that AT&T's actions were *ultra vires*. *NLRB v. Dominick's Finer Foods*, 28 F.3d 678 (7th Cir.1994).

misrepresentations to the plaintiffs which caused the plaintiffs not to file their action within the applicable period of time. Plaintiffs make no claim that AT&T said anything to them after the grievance was denied that caused them not to file this action within the applicable period of time. Indeed, plaintiffs admit that at no time did AT&T tell them that Article 17 would apply or that AT&T stated anything to them that would have lead them to believe that the company would change its mind as to the application of Article 19. Further, each plaintiff admitted they made no effort to contact the CWA to determine the status of the grievance, thus the CWA could not have mislead them. *See Burnett v. Montgomery Ward & Co.*, 678 F.Supp. 1423, 1429 (W.D.Mo.1988)(holding that tolling was inappropriate when plaintiffs did not rely on union's assurances that it was pursuing grievance).

■ The Court agrees with the defendant that AT&T's alleged bargaining with the IBEW is irrelevant to its analysis regarding the doctrine of equitable tolling. The policy behind equitable tolling has been described as follows:

> [n]o man may take advantage of his own wrong. Deeply rooted in our jurisprudence this principle has been applied in many diverse cases by both law and equity courts and has been employed to bar inequitable reliance on the statute of limitations.... The principle is that where one party has by his representations or his conduct induced the other party to a transaction to give him an advantage which it would be against equity and good conscience for him to assert, he would not in a court of justice be permitted to avail himself of that advantage. .

*Glus v. Brooklyn E. Dist. Terminal*, 359 U.S. 231, 232–34, 79 S.Ct. 760, 761–63, 3 L.Ed.2d 770 (1959). In the instant case, the alleged illegal bargaining with the IBEW has nothing whatsoever to do with plaintiffs' grievance filed against AT&T. The CWA continued to represent plaintiffs' interests until May of 1994 when the union abandoned the grievance procedure. The alleged illegal bargaining took place before the grievance was even filed by the CWA. Thus, the

"cause-and-effect" relationship between the alleged inequitable conduct and the tardy filing of the lawsuit is completely lacking. The fact that the defendant may have been negotiating with the IBEW could not toll the statute of limitations in the present case.

### 2. Equitable Estoppel

Plaintiffs also argue that equitable estoppel should apply because they lacked knowledge of the misrepresentation regarding the IBEW contract. Further, they contend that they had a good faith reliance on the misleading conduct of the defendant, and have suffered detriment or prejudice from such reliance. Arguably, plaintiffs' "reliance" was on the fact that the CWA was still acting as their union in prosecuting the grievance. The Court fails to see how this reliance was misplaced. Based on the record before the Court, the CWA was, in fact, still acting as their union and prosecuting their claim up until at least May of 1994. Therefore, there does not appear to be any detriment to the plaintiffs by the fact that they relied on the union to protect their interests. The Court fails to see the connection between the IBEW bargaining and the equitable estoppel argument put forth by the plaintiffs.

### 3. Repudiation of the Collective Bargaining Agreement

■ Finally, plaintiffs argue that the effect of the June 1993 contract with the IBEW was a repudiation of the CWA collective bargaining agreement which forms the basis of this lawsuit. They specifically contend that the grievance and arbitration provision of the CBA was repudiated by AT&T. Therefore, they argue that the most analogous state statute, rather than the six-month limitations period, should be applied in this case. *See Garcia v. Eidal Int'l Corp.*, 808 F.2d 717 (10th Cir.1986), *cert. denied*, 484 U.S. 827, 108 S.Ct. 94, 98 L.Ed.2d 55 (1987). According to plaintiffs, the most analogous Arkansas statute is the five-year breach of contract statute, Arkansas Code Annotated Section 16–56–111, which had not yet expired at the commencement of this action in May 1995.

The Court rejects plaintiffs' argument that it should apply the Arkansas breach of con-

tract statute of limitations. First, the United States Supreme Court has clearly indicated that it is not proper to borrow a state statute of limitations in most Section 301 claims. *DelCostello, supra* (stating that the application of a longer state law period of limitations would run contrary to the policy of "relatively rapid final resolution of labor disputes favored by federal law").

As a second basis, the Court would note that application of the *Garcia* case cited by the plaintiffs is not warranted in the present case. *Garcia* stands for the proposition that a state breach of contract limitations period should be applied when the employer has actually repudiated the grievance and arbitration process contained in the CBA. *See, e.g., Carrington v. RCA Global Communications, Inc.,* 762 F.Supp. 632, 638 (D.N.J.1991)(stating that in order for plaintiff to take a claim out of the "hybrid" category the employer must have actually repudiated the contract's grievance procedures).

In determining whether one party has so repudiated his promise to arbitrate that the other party is excused, the circumstances of the claimed repudiation are critically important. *Garcia,* 808 F.2d at 721. "An employer's repudiation may take the form of either an express refusal to abide by contractually established grievance and arbitration machinery, or conduct which renders the employer unable or apparently unable to comply." *Id.*

The Court agrees with the defendant that the grievance and arbitration provisions of the CBA were not repudiated in June 1993 by AT&T as the result of the IBEW bargaining. The CWA filed the grievance in March 1994 and AT&T accepted and processed the grievance in accordance with its collective bargaining agreement with the CWA. Furthermore, it appears that the grievance went on to Master Bargaining after that point, but was denied by AT&T sometime prior to May 10, 1994. Obviously, AT&T and the CWA considered the grievance and arbitration provisions of the CBA to be in full force and effect as late as Spring of 1994. Therefore, the Court concludes that application of the Arkansas breach of contract limitations is not warranted in the present case.

## III. CONCLUSION

Based on the record before the Court, it appears that there is no genuine dispute of material fact presented regarding the statute of limitations issue. Therefore, the Court finds that summary judgment should be, and hereby is, granted in favor of the defendant, AT&T. Plaintiffs' Complaint will be dismissed under separate Judgment.